<hr/>

[No. 4772.]

## The Denver & Rio Grande Railroad Company v. Gannon.

1.  **Appellate Practice — Verdict — Evidence — Materiality of Instructions.**

    In an action against a railroad company for injuries to a switchman, the jury found that the proximate cause of the injuries was the combined effect of a failure to block the frogs and guard-rails, and the engineer's negligence. Held, that, since neither cause operating alone was the proximate cause of the injuries, the correctness of the court's instructions in submitting each alleged act of negligence was material.—P. 199.

2.  **Master and Servant—Assumption of Risk—Frog-Blocking Act—Statutory Construction.**

    Chapter 69, Sess. Laws 1897, requires all railroad frogs and guard-rails to be properly blocked; and provides that, in case of personal injuries to employees resulting from the company's failure so to do, proof of such failure shall be prima facie evidence of negligence. Held, that such act confers no new right on the employee, and does not affect the common-law rule of assumption of risk.—P. 200.

*Appeal from the District Court of Fremont County.*
*Hon. M. S. Bailey, Judge.*

Action by Claude W. Gannon against The Den-

ver & Rio Grande Railroad Company. From a judgment for plaintiff, defendant appeals.

Decision *en banc.*      *Reversed and remanded.*

Messrs. WOLCOTT, VAILE & WATERMAN, Mr. ELROY N. CLARK, and Messrs. WALDO & DAWSON, for appellant.

Messrs. SKELTON & MORROW, for appellee.

Mr. JUSTICE GODDARD delivered the opinion of the court:

On the 6th day of March, 1902, while engaged in the service of the appellant (defendant below) as switchman in its yard at Florence, Colo., in attempting to couple a standard-gauge car to a narrow-gauge car, the appellee (plaintiff below) was seriously injured by reason of certain alleged acts of negligence of appellant set forth in the complaint as follows:

"1.  That by and through the carelessness, negligence and default of the defendant and its servants, it knowingly permitted the frogs and guard-rails in said yard (at Florence) at said time (the date of the injury) to become and remain and be used without any blocking whatever.

"2.  That the engineer who had charge of the locomotive which was used at said time and place pushed said cars together at a rapid and dangerous rate of speed, and failed to watch for and observe the signals given to him, and failed to stop said locomotive at the proper time and when signaled so to do. * * * That through and by reason of the carelessness, negligence and default of the defendant heretofore mentioned, and through and by reason of the carelessness, negligence and default of defendant's engineer, the said plaintiff was * * * knocked down and * * * run over."

The court submitted to the jury the two grounds of negligence as above alleged, and also submitted some interrogatories, among them the following:

"2d.  Was the place which plaintiff chose to step in front of said car a reasonably safe place for the purpose for which he testified he stepped in front of said car?  Answer:  Yes.

"5th.  Did the fact of plaintiff's stepping in front of said car at the time and place where he testified he stepped in front of said car, proximately contribute to the injury which he sustained?  Answer: Yes.

"6th.  At the time plaintiff stepped in front of said car, did he know, or by the exercise of reasonable care should he have known, of the unblocked condition of the frogs and guard-rails at the place where he stepped in front of said car and immediately west from said point?  Answer:  Yes.

"8th.  If you find for the plaintiff, state what act or acts of negligence on the part of the defendant company or its employees was or were the immediate, direct and proximate cause of the injury to him."

The answer to this was as follows:

"1st.  Defendant negligent in failing to block frogs and guard-rails.

"2d.  Engineer negligent in failing to watch for signals, and also negligent in increasing rate of speed."

The jury also returned a general verdict for the plaintiff.

It was the duty of the appellee, as a member of the switch crew, to assist in making couplings and to open and close switches.  He had been engaged in railway work, off and on, about seven or eight years in different capacities; had been working for the appellant about three months as switchman in

the Florence yards. At the time of the accident he was placing three links in the end of a standard-gauge car preparing to couple it with a narrow-gauge car. He describes the occurrence as follows:

"When I started to go in front of that car it was approaching very slowly, at such a rate of speed as to be perfectly safe. As I started to run back sideways, and insert the links in the automatic coupler, then I heard the engine exhausting and dropped everything and started to get out. I dropped the links right in the middle of the track; I stepped in the end of the guard-rail that comes alongside of the rail like that, and my foot went down into the end of it here, my heel clear up to the hollow of my foot. Had I not caught my foot in that manner, I would have gotten out without injury."

Among other instructions, the court gave the following:

"8th. The defendant was guilty of negligence, under a statute of the state, at the time plaintiff received his injury in failing to block its guard-rails, and if you believe from the evidence that plaintiff's injury was caused by such failure on the part of the defendant to block its guard-rails at said time and place, or that said failure on the part of the defendant to block its guard-rails concurred with some other cause or causes operating proximately at the same time, in producing the injury, then your verdict should be for the plaintiff and against the defendant, unless it is shown that his (plaintiff's) own negligence contributed to said injury, and that he would not have received the same but for his own negligence.

"9th. The plaintiff did not assume the risk occasioned by the failure on the part of defendant to block its frogs and guard-rails; and if you believe from the evidence that said injury was caused by

the failure on the part of defendant to so block its frogs and guard-rails, and that said failure concurred with some other cause or causes, all operating proximately at the same time in producing the injury, then you should find for the plaintiff and against the defendant, unless it has been satisfactorily shown by the evidence that the plaintiff was guilty of negligence directly contributing to said injury, and without which the same would not have occurred.''

The controlling question, as we view it, is presented by the assignments of error based upon the giving of these instructions. It is contended by counsel for appellee, quoting from page 3 of his brief, as follows:

''Even if the case was erroneously submitted as to one act of negligence, it affirmatively appears from the record in the case that the defendant was not prejudiced thereby, for the verdict would have been the same if the act of negligence which was erroneously submitted to the jury was entirely withdrawn from their consideration.''

If the evidence had permitted, and the jury had found, that the proximate cause of the accident was the negligence of the defendant in either one of the above respects alone, there would be some basis for this argument; but the jury found, and the testimony shows, that the proximate cause of the plaintiff's injuries was the combined effect of the failure to block the frogs and guard-rails, and the engineer's negligence; and it was apparent that, in the absence of either one of these acts of alleged negligence, the accident would not have occurred, and that neither one operating alone was the proximate cause of the plaintiff's injury.

It is, therefore, necessary to determine whether the court, in submitting either of the alleged acts of

negligence, announced the law applicable to the facts upon which the particular charge of negligence was based, and correctly defined the duties and obligations imposed upon the respective parties under the existing conditions.

The reciprocal duties and obligations of employer and employee imposed by the common law are well settled. It devolves upon the employer the duty of furnishing the employee a reasonably safe place in which to work. It requires the employee to use his faculties, as an ordinarily prudent man would, to avoid injury. If the employer neglects to perform his duty in the respect above mentioned and the employee, without fault on his part, is injured as the result of such negligence, the employer must answer in damages; but if the defect is obvious and the danger apparent and the employee has equal knowledge with the employer of its existence, and voluntarily enters upon, or continues in, the service, he assumes all the risk naturally and reasonably incident to the service.—*Lord v. Pueblo S. & R. Co.,* 12 Colo. 390, 394; *B. & C. R. R. Co. v. Liehe,* 17 Colo. 280, 283; *Denver Tram. Co. v. Nesbit,* 22 Colo. 408, 411; *D. & R. G. R. R. Co. v. Scott,* 34 Colo. 99, 106.

*Appel v. Buffalo, N. Y., etc., Railroad,* 111 N. Y. 550, was similar in its facts to the case before us. A brakeman was employed in coupling cars in the yard of the defendant. While so engaged his foot was caught in an unblocked frog and he was run over and killed. The court of appeals held that, ''in accepting and continuing in the employment, the deceased assumed the hazard of all known and obvious dangers, and that he was chargeable with notice of the difficulty in removing the foot when caught in the frog, and of the danger to be apprehended therefrom, and therefore that a cause of action was not made out, and a refusal to nonsuit

was error." To the same effect is the *Southern Pac. Co. v. Seley,* 152 U. S. 145.

It is conceded by counsel for appellee that this rule would apply, and appellee would have assumed the risk of the unblocked guard-rails, except for the statute known as the frog-blocking statute (Session Laws 1897, p. 258), which, he contends, abolished the doctrine of the assumption of risk occasioned by the failure to block frogs and guard-rails as required by its provisions. In other words, the claim is that the statute, having imposed a specific duty upon the railroad company, it is not within the power of the company and its employees, by contract or otherwise, to relieve the company from the performance of such duty or liability for an injury resulting from its failure to discharge such duty.

The first section of the statute enacts that it shall be the duty of railroad companies to block their frogs and guard-rails, specifying the manner in which such blocking shall be done. The second section provides as follows:

"In all trials in all courts in this state, to recover for personal injury, and in all cases of personal injury to employees, or other persons, occasioned by, or in any manner directly or indirectly resulting from being caught between any of the aforesaid rails, testimony relative to compliance with the requirements of this act shall be admitted. And where a failure is shown on the part of any such corporation, company or persons to have safely and securely blocked such rails in accordance with the provisions of this act, such failure to have complied with any of the provisions of this act shall be *prima facie* evidence of the negligence of any such corporation, company or other person so failing to comply with any of the provisions of this act where any such employee, or other person, may be caught

between such rails not blocked in accordance with the provisions of this act."

It will be observed that the act does not, as in the federal Safety Appliance Act, and in the statutes of several of the states, expressly abolish the assumption of risk, but makes the failure to comply with its provisions *prima facie* evidence of the negligence of the company. It confers no new right upon an employee, but makes the failure to do certain specific things *prima facie* evidence that the company has neglected a duty that was always imposed upon it by the common law, to wit, to furnish a reasonably safe place in which to work. In other words, the legislature has specified the blocking of frogs and guard-rails as among the things necessary to make the place in which cars are switched and coupled safe for the performance of this work.

This act was under consideration in the recent case of *Denver & R. G. R. R. Co. v. Norgate,* 141 Fed. 247, and upon a state of facts similar to those presented in this record, and it was held that it did not take away from the railroad company the defense of assumed risk. Carland, district judge, speaking for the court, said:

"We are clearly of the opinion that the frog-blocking act of Colorado, * * * did not take away from the railroad company the defense of assumption of risk in this case. * * * It is conceded that the common law declares that Norgate, when he entered the employ of the railroad company, assumed all the risks and dangers of his occupation which were known to him, and all of which a reasonably prudent man in his situation would have known. By the ruling of the trial court this old and well-established rule of the common law was held to have been repealed by the statute of Colorado, providing for the blocking of frogs and guard-rails.

We first naturally turn to the law itself to find the repeal. We find the law expressed in clear, unambiguous terms, and, this being so, we are not permitted to go elsewhere to find the meaning and intention of the law-making power. Nothing whatever is said in the law as to assumption of risk. The legislature could have easily repealed this principle of the common law above quoted, as other legislatures have done.—Code Iowa 1888, § 2002; Acts Texas 1891, p. 25, c. 24; Acts Fla. 1891, p. 113, c. 4071; Acts Wyo. 1890-91, p. 350, c. 80, § 17; Burns' Ann. Stats. Ind. 1901, § 708. But, instead thereof, the legislature simply imposed the duty upon railroad companies of blocking their frogs and guardrails, and further provided that a failure to do so should be *prima facie* evidence of negligence.''

In the case of *St. Louis Cordage Co. v. Miller,* 126 Fed. 495, 509, it was said that: ''The factory act of Missouri (2 Rev. Stats. 1899, § 6433) does not abolish the defense of assumption of risk in cases which fall under its provisions. In this respect it differs from the act of the Congress of the United States (Act March 2, 1893, c. 196, 27 Stat. 531 [U. S. Comp. Stats. 1901, p. 3174]), which requires cars engaged in interstate commerce to be equipped with automatic couplers. Congress in that act expressly provided that in case the railroad companies failed to comply with its terms, the employees should not be deemed to have assumed the risk thereby occasioned. * * * The legislature of Missouri had power to apply a similar provision to cases in which employers failed to keep their machinery safely and securely guarded, but they did not do so.'' '

And in *Nottage v. Sawmill Phoenix,* 133 Fed. 979, 981, in discussing a statute of the state of Washington which provided for protection of employees in factories and mills, Hanford, J., said:

"This is a penal statute, enacted by the legislature in the exercise of the police power of the state, and it contains no provision purporting to affect in any way the rules of law applicable to civil actions. It gives no hint of an intention to confer upon injured employees any new right enforceable in an action to recover damages, nor does it express a legislative intent to change the common law by abolishing defenses recognized by, the common law, nor does it prescribe an arbitrary rule of evidence, like the provision contained in the act of congress making the use of automatic couplings on railroad trains compulsory, which prescribes, in effect, that trainmen shall not be deemed to have assumed the risk of injuries from their employment on trains not provided with automatic couplers. * * * The courts have no authority to extend or amplify the provisions of statutes so as to make them comprehend additional rights and remedies which the legislature omitted to provide. A statute which is plain and free from ambiguities is not subject to judicial construction, but must be interpreted by the courts and enforced according to the legislative intention expressed by the words."

In *Bradley v. People,* 8 Colo. 604, Elbert, J., speaking for the court, said: "The common law is as much to be taken into account in construing a statute as a previous statutory enactment * * * 'a statute, general in its terms, is always to be taken as subject to any exceptions which the common law requires.' "

In 2 Lewis' Sutherland Statutory Construction, section 453, original section 289, the following language is used:

"The principles of the common law pervade and permeate everything which is subject to legal regulation. * * * By its principles statutes are read

and construed. They supplement or change it, and it adjusts itself to the modification and operates in conjunction and harmony with them. * * * Rules of interpretation and construction are derived from the common law, and since that law constitutes the foundation and primarily the body and soul of our jurisprudence, every statutory enactment is construed by its light and with reference to its cognate principles.''

In *Hesse v. Columbus, etc., R. Co.*, 58 Ohio St. 167, the court had before it a statute similar to ours, in that it made proof of a failure to comply with its requirements prohibiting the railroad company from operating cars or locomotives which were in any manner defective, *prima facie* evidence of negligence on the part of the company, and in construing the statute, the court said:

''The act, by its terms, affects the rules of evidence. It does not affect the duty of the employee, nor the rules of pleading with respect to it. In the cases to which it applies it raises against the corporation a *prima facie* presumption of negligence from evidence showing that the employee received an injury by reason of a defect in the car or locomotive, or the machinery or attachments thereto belonging. In *Coal Co. v. Norman*, the general rule covering cases of this character is stated: 'The servant, in order to recover for defects in appliances, must establish three propositions: (1) that the appliance was defective; (2) that the master had, or should have had, notice thereof; (3) that the servant did not know of the defect.' The force of the statute under consideration is wholly expended in relieving the servant of the duty of establishing the second of these propositions. His duty with respect to the first and third remains wholly unaffected.''

It is manifest that the statute, when tested by

the rule announced by the foregoing authorities, does not, in terms or by implication, affect the law of assumption of risk, and that such defense was available by appellant in this case unless, as contended by counsel for appellee,. the imposition of the statutory duty in itself abrogated the law and deprived it of such defense.

Several cases are cited which hold that "statutes imposing a positive duty upon the master by implication repeal the law of the assumption of risk," among them the case of *Narramore v. Cleveland C. C. & St. L. Ry. Co.,* 96 Fed. 298, in which it was said that: "An assumption of risk is a term of the contract of employment, expressed or implied, by which the servant agrees that dangers of injury obviously incident to the discharge of the servant's duty, shall be at the servant's risk."

That this is a mistaken view of the law regarding the assumption of risk, we think is demonstrated in *D. & R. G. R. R. Co. v. Norgate, supra,* and in many other cases, among them: *St. Louis Cordage Co. v. Miller, supra; Langlois v. Dunn Worsted Mills,* 57 Atl. (R. I.) 910; *Martin v. C. R. I. & P. R. Co.,* 118 Ia. 148; *O'Maley v. South Boston Gaslight Co.,* 158 Mass. 135; *Knisley v. Pratt,* 148 N. Y. 377; *Swenson v. Osgood, etc., Mfg. Co.,* 91 Minn. 509; *Powell v. Ashland, etc., Co.,* 98 Wis. 35; *Helmke v. Thilmany,* 107 Wis. 216; *Nottage v. Sawmill Phoenix, supra; B. R. & E. Co. v. Allen,* 99 Ala. 359; *C. C. & St. L. Ry. Co. v. Ullom,* 20 Ohio C. C. Reps. 512; Dresser on Employers' Liability, § 82; 2 Labatt on Master and Servant, §§ 649, 650.

In *D. & R. G. R. R. Co. v. Norgate, supra,* Carland, J., referring to the language used by Judge Taft as quoted above in the *Narramore case,* said:

"Is it possible that an old-established principle of the common law depends for its existence in each

case of employment upon the agreement of the parties? The law regarding the assumption of risk is the law which governs the relation of master and servant, and is independent of the will of either. It is not a term of the contract of employment. If it were, then the master and servant could retain it or abolish it in each contract of employment. But they can do neither. It is a principle of the common law, and must be repealed, if at all, by the law-making power. It is the law of the land governing all persons who assume the relation of master and servant. It is over and above the contract, and depends in no manner for its existence upon the agreement of the parties. It is founded upon public policy, the status assumed by master and servant, and upon the maxim, *'volenti non fit injuria.'* The law establishing the reciprocal duties and obligations of master and servant never originated out of contract, in the sense that the master and servant ever expressly agreed to them. But the common law imposed these duties and obligations as a regulation of those who assumed this relation, regardless of the desires of the master or the servant.''

In the case of *Martin v. C., R. I. & P. R. Co., supra,* the court discusses and disapproves of the *Narramore case,* using the following language:

"We think the learned judge, in writing that opinion, assumed too much, in treating the assumption of risk as purely a matter of contract. True, the books speak of it as resting on an implied agreement between the employer and employee. It is more accurate to say that the services of the one are engaged by the other, and from the relationship the law implies certain duties, obligations, and disabilities. No mention is made of these, but they pertain to the relationship of the parties and the status then assumed.  *  *  *  Nor can we approve of the dis-

tinction attempted to be drawn between employment under conditions condemned as dangerous at the common law and those prohibited by a city ordinance. In the absence of an assumption of the risk, an omission of a duty implied by law is precisely as effective in fixing liability as though enjoined by statute. The obligation of the employer to the servant is no greater in the one case than in the other, and we can discover no sound reason for the discrimination which declares the danger in the one case may be assumed, and in the other may not. * * * Our study of the subject has led to the conclusion that, in the matter of assumption of risks, it is immaterial whether they arise from the violation of a common-law duty, or an obligation imposed by statute. * * * And it can make no difference whether the statute relates to the condition of the place where the work is to be done, or the method to be pursued in performing it. If the employee, with full knowledge of either, undertakes to accomplish the task assigned at the place or in the method proposed, he ought not to be permitted to complain when conditions and methods were precisely as he knew they would be, and to which he has assented.''

Dresser on Employers' Liability, at section 82, says:

''When a person engages to work for another, both a contract and a status are created. * * * Although the contract of hiring depends upon the same principles as other contracts, yet it has one peculiarity, in that it creates a status or relationship between the parties to which the policy of the law has affixed certain rights, duties and disabilities to be observed by each, irrespective of any understanding or supposed agreement between them. These duties and disabilities arise when the relation is created, and continue until it ends, and, for the most

part, are determined by the condition of affairs when the contract of hiring is made. It is usual and convenient to treat them as terms of an implied contract, but it is a contract implied from the relationship, and not from the agreement of the parties, and has none of the incidents of a technical contract."

The supreme court of Rhode Island, in *Langlois v. Dunn Worsted Mills,* said:

"The question whether a plaintiff can recover for a breach of statutory duty, notwithstanding an assumption of risk or contributory negligence on his part, is one on which there is some difference of opinion, but we think the clear weight of reason and authority is against such recovery. A statutory duty is no more imperative in law than a common-law duty. A penalty may be imposed upon the offender for a breach of statute, but it does not change the relations between the parties, except to the extent that one entering the employ of another may assume, in absence of knowledge, that the terms of the statute have been complied with. * * * It is also well settled that a court will not presume that a statute intended to change a rule of common law unless such an intent appears. * * * It has been common practice here and elsewhere to construe statutory duties in connection with assumed risks and contributory negligence. For example, ever since the advent of railroads, statutes have required the sounding of a bell or whistle in approaching a highway crossing. Yet, though the statute should be negligently disregarded, it has never been held that a plaintiff seeing the approach of a train, and injured while attempting to cross ahead of it, could recover. He would be held to have assumed the risk of so crossing, or to have been guilty of contributory negligence. The mere fact that the rail-

road company had violated the statute would not warrant a recovery."

In *O'Maley v. South Boston Gaslight Co.*, Knolton, Justice, speaking for the court, said:

"The doctrine of assumption of risk of his employment by an employee has usually been considered from the point of view of a contract, express or implied; but, as applied to actions of tort or negligence against an employer, it leads up to the broader principle expressed by the maxim, '*volenti non fit injuria.*' One who, knowing and appreciating a danger, voluntarily assumes the risk of it, has no just cause of complaint against another who is primarily responsible for the existence of the danger. As between the two, his voluntary assumption of the risk absolves the other from any particular duty to him in that respect, and leaves each to take such chances as exist in the situation, without a right to claim anything from the other. * * * The statute does not attempt to take away the right of the parties to make such contracts as they choose, which will establish their respective rights and duties. * * * It would be an unwarranted construction of the statute, which would tend to defeat its object, to hold that laborers are no longer permitted to contract to take the risk of working where there are peculiar dangers from the arrangement of the place, and from the kind or quality of the machinery used. Nothing but the plainest expression of intention on the part of the legislature would warrant giving the statute such an interpretation."

In *Knisley v. Pratt,* the court of appeals of New York uses the following language:

"In order to sustain the judgment in favor of plaintiff, it is necessary to hold that where the statute imposes a duty upon the employer, the performance of which will afford greater protection to the

employee, it is not possible for the latter to waive the protection of the statute under the common-law doctrine of obvious risks.   We regard this as a new and startling doctrine, calculated to establish a measure of liability unknown to the common law, and which is contrary to the decisions of Massachusetts and England under similar statutes.   *   *   * We think this proposition is essentially unsound, and proceeds upon theories that cannot be maintained.   It is difficult to perceive any difference in the quality and character of a cause of action, whether it had its origin in the ancient principles of the common law, in the formulated rules of modern decisions, or in the declared will of the legislature.. Public policy in such case requires its rigid enforcement, and it was never urged in the common-law action for negligence that the rule requiring the employee to assume the obvious risks of the business was in contravention of that policy.   *   *   *   We are of opinion that there is no reason in principle or authority why an employee should not be allowed to assume the obvious risks of the business as well under the factory act as otherwise.   There is no rule of public policy which prevents an employee from deciding whether, in view of increased wages, the difficulties of obtaining employment, or other sufficient reasons, it may not be wise and prudent to accept employment subject to the rule of obvious risks.   The statute does, indeed, contemplate the protection of a certain class of laborers, but it does not deprive them of their free agency and the right to manage their own affairs.''

We think the weight of authority, and the better reason, condemn the theory that ''assumed risk'' arises from the contract of employment, and base it upon the ground that the employment creates a status or relationship to which the law attaches cer-

tain reciprocal duties, obligations and disabilities which are not matters of agreement between the parties, and which have not been changed by the frog-blocking statute. It follows that the court in its instructions Nos. 8 and 9 misstated the law as applicable to this branch of the case, and erred in not giving instruction No. 7 asked by appellant.

As the judgment must be reversed for the reasons given, it becomes unnecessary to consider the other assignments so ably and exhaustively argued by respective counsel.

Judgment reversed and cause remanded.

*Reversed.*

Decision *en banc,* all the justices concurring. except CHIEF JUSTICE STEELE not participating.