KYNER v. PORTLAND GOLD MINING CO.

(Circuit Court of Appeals, Eighth Circuit.   December 29, 1910.)

No. 2,893.

1. MASTER AND SERVANT (§ 219*)—UNGUARDED MACHINERY—ASSUMED RISK.
   Where the absence of a guard about the drum and lower cable of a mine hoist was so patent as to be readily observed, and the enhanced danger arising therefrom was so obvious that its appreciation by plaintiff was unavoidable considering his years, intelligence, and experience, he assumed the risk of injury because of the absence of a guard, by voluntarily continuing to work about the drum and cable without it.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 610–624; Dec. Dig. § 219.*
   Assumption of risk incident to employment, see note to Chesapeake & O. R. Co. v. Hennessey, 38 C. C. A. 314.]

2. MASTER AND SERVANT (§§ 101, 102*)—INJURIES TO SERVANT—DUTY OF MASTER.
   A master is not bound to make the place in which and the machinery about which a servant is working absolutely safe, but is only required to exercise ordinary care to make them reasonably safe.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 135, 171, 178–184, 192; Dec. Dig. §§ 101, 102.*]

3. MASTER AND SERVANT (§ 265*)—INJURIES TO SERVANT—NEGLIGENCE—BURDEN OF PROOF.
   In an action for injuries to a servant, the burden of affirmatively proving a breach of the master's duty to use ordinary care to make the place in which the servant is required to work and the machinery about which he is employed reasonably safe is on the plaintiff.
   [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 877–908; Dec. Dig. § 265.*]

4. MASTER AND SERVANT (§ 278*)—INJURIES TO SERVANT—NEGLIGENCE—EVIDENCE.
   In an action for injuries to a servant by becoming caught in the cable of a mine hoist, evidence held insufficient to warrant a finding of negligence, in that the engineer at the time of the injury suddenly increased

---

the speed of the hoist without signal or warning to plaintiff, though knowing plaintiff at the time was in the act of stepping over the cable.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954–972; Dec. Dig. § 278.*]

5. EVIDENCE (§ 123*)—RES GESTÆ—STATEMENTS OF SERVANT.

Evidence that defendant's engineer stated to plaintiff, while visiting plaintiff at a hospital about 10 hours after the injury, that it was the engineer's fault that plaintiff was injured, was inadmissible as res gestæ.

[Ed. Note.—For other cases, see Evidence, Dec. Dig. § 123.*]

6. WITNESSES (§ 248*)—RESPONSIVENESS OF ANSWER.

Plaintiff, in an action for injuries, on his examination in chief stated that defendant's engineer, immediately after the accident, and at the place thereof, said that "he couldn't help it." On cross-examination defendant's counsel asked plaintiff when he first conceived the idea that the engineer was negligent, to which plaintiff answered, "He told me it was his fault down in the hospital." *Held*, that the answer was not so responsive to the question as to be allowed to stand, under the rule that one may not object to testimony which he has himself called forth.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 861–863; Dec. Dig. § 248.*]

In Error to the Circuit Court of the United States for the District of Colorado.

Action by Percy E. Kyner against the Portland Gold Mining Company. Judgment for defendant, and plaintiff brings error. Affirmed.

Charles D. Hayt (Edward J. Boughton, Clyde C. Dawson, and Fred R. Wright, on the brief), for plaintiff in error.

William E. Hutton and Charles W. Waterman, for defendant in error.

Before VAN DEVANTER and HOOK, Circuit Judges, and CARLAND, District Judge.

VAN DEVANTER, Circuit Judge. While employed as an engineer's helper or oiler in the engine house of a mine in Colorado, the plaintiff in error was caught, thrown, and injured by a moving cable over which he was stepping at the time, and he now complains that, upon the trial of an action brought by him against his employer, the defendant in error, to recover damages for the injuries so sustained, the Circuit Court directed a verdict against him. The only evidence relating to the circumstances surrounding the injury was that given by the plaintiff himself, and it conclusively established these facts: In the engine house were an engine and hoist used in raising and lowering the cages in a double compartment shaft which extended down into the mine 500 feet. The engine controlled a double drum about which were wound and unwound two cables; one connecting with each cage. The cables were so arranged that one wound and unwound from the top of one section of the drum and the other from the bottom of the other section, and so the drum moved the cables in opposite directions and lowered the cage in one compartment at the same time that it raised the cage in the other. The cables extended directly from the drum to a pair of pulleys above the collar of the shaft and thence vertically downward to the cages. These pulleys

were approximately 150 feet distant from, and about 45 feet higher, than, the drum, so the direction of the cables from the drum was that of an ascending incline. Between the pulleys and the drum, some distance from the latter, the cables passed between rollers the purpose of which was to support and steady the cables. The drum was set in a pit; but $3\frac{1}{2}$ feet of its diameter was above the surrounding floor. The lower cable came within 6 inches of the floor at the edge of the pit, which was 2 feet from the drum, and the upper cable was high enough at that point to permit a man to walk thereunder. No guard rail or other protecting device was about the drum or lower cable, and this was manifest. When operating the hoist the engineer stood upon an 8-inch elevation 12 feet behind the drum, and there, with his face toward the drum, manipulated the levers or appliances for starting, controlling, and stopping the hoist. The cables leading to the shaft were in front of the drum, but they were not wholly within the engine room, for the shaft was about 75 feet beyond it. In addition to the landings at the top and bottom of the shaft, there were two at intervening levels in the mine. The cages were double decked, and in loading and unloading a separate stop was made for each deck. Between the engineer and the drum were a signal bell, an electric flash signal device, and two clock-faced indicators showing the movement and position of the cages. The bell and electric flash were used according to an established code in giving to the engineer signals in obedience to which he started, controlled, and stopped the hoist; but the signals were not described in the evidence, save as it was shown that after the upper deck of a cage was loaded the bell was rung once as a signal for raising the cage sufficiently to permit the loading of the lower deck, and after that deck was loaded the bell was rung once again as a signal for raising the cage to the top. A half revolution of the drum made the requisite change in the position of the decks, and it took one minute to raise the cage to the top and then unload it. Usually a signal to lower the cage followed almost immediately after the unloading was completed.

The plaintiff was 22 years old, was of a good degree of intelligence, and had been in the defendant's service four weeks, the first two as a boiler maker's assistant and the last two as a helper or oiler in the engine room. When entering upon the latter service, he was informed by the master mechanic and the engineer that the latter would instruct him as to his duties and would look out for him. According to his instructions, it became his duty to oil the axle of the drum by screwing down two oil cups thereon, one near either end of the drum, and to wipe off the engine and clean the floor. He screwed down the oil cups every 5 or 10 minutes, and in each instance had to pass from one end of the drum to the other. There were two ways of making this passage in safety; one by going around behind the engineer, and the other by crossing directly in front of the drum pit when the hoist was at rest. By the first way, which was the longer one, the passage could be made within the time required to raise a cage to the top, and by the other it could be made during any of the customary stops. But a single stop usually was not long enough to enable the oiler to screw down both oil cups and pass from one to the

other. And, while the cups could be screwed down only when the hoist was at rest, it was not necessary that both be attended to during the same stop. One could be screwed down at one stop and the other at another. On the occasion in question the plaintiff screwed down one cup while the hoist was at rest, and then, while it was in motion, attempted to pass to the other cup by the shorter way. In doing so he in some way was caught by the lower cable, carried almost halfway around the drum, and severely injured. Mention of other facts disclosed by the evidence will be made later.

The negligence charged in the complaint as the proximate cause of the injury was as follows: First, that the defendant was negligent in failing to provide a suitable guard about the drum and lower cable; second, that through the negligence of the defendant the rollers, between which the lower cable ran, had become so worn that the cable was not held steady when running, but jerked and vibrated violently; and, third, that it was the duty of the engineer when about to change the speed of the hoist to give a warning thereof to other employés about the hoist, and that in negligent disregard of this duty, and as the plaintiff was stepping over the cable, the engineer, with knowledge of the plaintiff's position, and without any warning to him, suddenly increased the speed of the hoist, and this without having received any signal so to do. The answer denied the negligence so charged and set up the defenses of assumption of risk and contributory negligence.

With this statement of the circumstances surrounding the injury and of the issues presented by the pleadings, we come to consider whether in any reasonably admissible view of the evidence a verdict for the plaintiff lawfully could have been sustained. If so, the court erred in directing a verdict for the defendant; otherwise that ruling was right.

As respects the first specification of negligence, it conclusively appeared that the absence of a guard about the drum and lower cable was so patent as to be readily observed; that the enhanced danger arising therefrom was so obvious that its appreciation by the plaintiff was unavoidable, in view of his years, intelligence, and experience; and that under those conditions he voluntarily continued to work about the drum and cable. So, even if the absence of a guard was a negligent omission on the part of the defendant, the court was bound to rule, as matter of law, that the plaintiff assumed the risk incident thereto. Butler v. Frazee, 211 U. S. 459, 29 Sup. Ct. 136, 53 L. Ed. 281; American Linseed Co. v. Heins, 72 C. C. A. 533, 141 Fed. 45; Missouri, Kansas & Texas Ry. Co. v. Wilhoit, 87 C. C. A. 401, 160 Fed. 440; Federal Lead Co. v. Swyers, 88 C. C. A. 547, 161 Fed. 687; United States Smelting Co. v. Parry, 92 C. C. A. 159, 166 Fed. 407; Denver & Rio Grande R. R. Co. v. Gannon, 40 Colo. 195, 200, 90 Pac. 853, 11 L. R. A. (N. S.) 216.

The second specification of negligence was, as we think, without any substantial evidence to sustain it. The plaintiff testified that immediately after his injury the "particular rollers" then in use were "in bad condition" because "they were cut," and that this permitted the cable to vibrate more than it otherwise would have done; but the extent of the cutting was not more definitely stated, and there was no

evidence indicating whether the rollers were old or new, of what material they were made, whether they were inspected at reasonable intervals, when the cutting occurred, or whether the defendant knew of it prior to the plaintiff's injury. In short, there was no evidence that the defendant failed to exercise ordinary care in selecting the rollers or in observing how they withstood the use to which they were subjected, or that it continued to use them knowing that they were cut and not suitable for use. The duty which the defendant owed to the plaintiff in respect of the place in which and the machinery about which he was to work was not that of making them absolutely safe, but of exercising ordinary care to make them reasonably safe, and the burden of affirmatively proving a breach of that duty was with the plaintiff; so, in the absence of such proof, the defendant was entitled to rest upon the usual presumption of the exercise of ordinary care. Patton v. Texas & Pacific Ry. Co., 179 U. S. 658, 21 Sup. Ct. 275, 45 L. Ed. 361.

The third specification of negligence was to the effect that the engineer suddenly increased the speed of the hoist, including the cable, (a) without any signal so to do, (b) without any warning to other employes about the hoist, although it was his duty to give such a warning, and (c) without any warning to the plaintiff, although knowing that the latter was then stepping over the cable. Of this it is said in the brief for the plaintiff:

"Perhaps the most direct cause of the accident was the negligence of the engineer in starting up the hoist without proper signals, and starting it up suddenly, when he must have known what the effect of a sudden start would be upon the cable, and in starting it without warning the plaintiff, who, as the engineer saw, was in a dangerous position."

When the plaintiff attempted to step over the cable, the hoist was not at rest, but was raising to the top a loaded cage at the end of that cable and lowering a cage at the end of the other cable. Just prior thereto the hoist was moving at full speed, and the plaintiff was standing near the cable "waiting," as he stated, "for the cable to stop." Having attended to one oil cup when the hoist was last at rest, he was intending to pass to the other side and there to attend to the other cup. Presently the engineer applied the brake to the hoist, and it slowed down to such an extent that the plaintiff readily could see the strands of the moving cable. He then concluded to pass to the other side without further waiting, and as he was stepping over the moving cable the engineer materially increased the speed of the hoist. This produced a jerky or vibrating motion of the cable, and the plaintiff was thereby tripped and thrown upon the cable, and was carried partly around the drum. The evidence did not disclose the position of either cage when the speed of the hoist was slackened or when it was increased, and did not indicate that either of these movements was not in obedience to an appropriate signal. True, the plaintiff stated that he neither heard nor saw any signal to the engineer after the hoist was started; but he also stated that the electric flash device was used by the cager according to an established code in giving signals to the engineer, and that he (the plaintiff) was not at the time in a position to observe, and did not know, whether any such signals

were given after the hoist was started. Moreover, the conditions before recited, such as the depth of the shaft, the landings at the intermediate levels, and the simultaneous operation of the two cages, suggest that there well may have been some occasion for the changes made in the movement of the hoist. Thus the charge that the increased movement was not in response to a signal to the engineer entirely failed.

There was also a like failure of proof in respect of the charge that it was the duty of the engineer to give a warning to other employés about the hoist when he was about to change its speed. No evidence was presented which tended to show that any such general duty had been laid upon the engineer, or that he usually, or in any instance, had given such a warning. But it is said that, even although no such general duty rested upon him, he was in duty bound to warn the plaintiff, because when the latter entered the service as an oiler he was told that the engineer would look out for him. The contention is without merit. Doubtless what was said amounted to an assurance that the engineer would take such precautions for the plaintiff's safety as were reasonably appropriate in view of his want of familiarity with the service and its surroundings; but it did not mean, and reasonably could not have been regarded as meaning, that the plaintiff was absolved from exercising ordinary care for his own safety, or that the engineer would treat him as a novice, or as likely to assume positions of danger unnecessarily, after he became familiar with the service and its surroundings. At the time of his injury, he had worked about the hoist for two weeks, had come fully to understand how it was operated and all its surroundings, knew of the two ways of passing in safety from one end of the drum to the other, had made frequent use of both ways, could determine easily whether the cable was moving or was at rest, and knew it was inclined at times to jerk and vibrate very perceptibly. Not only so, but his testimony disclosed that on the occasion in question, after the cage at the end of the lower cable was loaded, the bell rang once as a signal to raise the cage to the top of the shaft, that he heard and understood that signal, that he knew the hoist was started in response to it, and that while the hoist was still in motion, and therefore before the cage reached the top, he attempted to step over the cable. Thus he had the benefit of that signal and knew its object was not accomplished. As respects his conduct on prior occasions, he testified in the course of his examination in chief:

"Q. And in doing this (attending to the oil cups) did you have to go from one side of the cable or drum to the other?
"A. Yes, sir.
"Q. And when would you do this?
"A. Always when he would unload and load up.
"Q. What is that for, at the time when the cable was still and the drum still?
"A. Yes, sir.

*   *   *   *   *   *   *   *   *   *   *   *   *   *

"Q. Had you at other times stepped over the cable when it was slowed down that way?
"A. I had stepped over when it was stopped.

"Q. Had you at other times stepped over when it was about to stop or slowed down?

"A. No, sir."

True, later in his examination in chief he testified that on prior occasions he had stepped over the moving cable, and this without attempting any explanation of the conflict, but he in no wise indicated that he had been instructed to pass over the cable while it was in motion or that the engineer had observed him do so. We conclude, therefore, that the claim that a special warning should have been given to him was without any support in the evidence, unless his real situation was known by the engineer.

We come then to the charge that the engineer materially increased the speed of the hoist without any warning to the plaintiff, although knowing that he was then stepping over the cable. Under the evidence, it must be accepted as true that the speed was materially increased, that no warning thereof was given, and that the plaintiff was then in the position described. And it must be conceded that, if the engineer knew the plaintiff was in that position, then ordinary care demanded that a suitable warning be given to him, even although otherwise a warning would not have been necessary; and this because the engineer knew that the change in speed was calculated to produce a jerky and vibrating motion of the cable which would make such a position one of obvious peril. So the crucial question is: Was there any evidence reasonably tending to show that the engineer knew the plaintiff was in that position? Certainly there was no direct evidence to that effect; but, as that alone is not decisive of the question, we turn to what is claimed to have been indirect proof to that effect. Principal reliance is placed upon testimony given by the plaintiff to the effect that, just before the speed was slackened, the engineer looked in his direction and "appeared to see" him, then looked at one of the indicators (the flash signals when given shone upon one of them), and then applied the brake. But as the plaintiff was then standing near the cable in a place of safety and was "waiting," as he stated, "for the cable to stop," the fact that the engineer appeared to see him then had no tendency to show that later on, when the speed was increased, the engineer knew he was attempting to step over the moving cable. It next is insisted that as the engineer stood with his face in the plaintiff's direction, and as there was no intervening obstruction to the view, it was a reasonable inference that the engineer observed what the plaintiff was doing. But the facts relied upon do not fully or fairly reflect the engineer's situation. As before indicated, he was charged with the engrossing task of closely watching the indicators and signal devices and of controlling the hoist with due regard to the position of the cages as shown upon the former and in strict obedience to the signals received through the latter, and the safety of the cager and others about the shaft, as also of the appliances connected therewith, depended upon an attentive performance of that task. In that situation, it well may be that he was so occupied, and properly occupied, with his own immediate task, that he neither did nor could observe what the plaintiff was doing; and so there was no reasonable basis for the inference suggested.

184 F.—4

In a written notice served upon the defendant about 60 days after his injury, the plaintiff stated that it was caused by "the omission to place a guard rail or fence across the cable" and by "the defective condition of the cable," no mention being made of any act or omission of the engineer; and upon his examination in chief he stated that immediately following the injury, and at the place thereof, the engineer said "he couldn't help it." Then upon the cross-examination, counsel for the defendant, evidently having in mind these statements of the plaintiff, inquired when he first conceived the idea that the engineer was negligent, and he answered, "He told me it was his fault down in the hospital," meaning that the engineer made this admission during a conversation in a hospital 10 hours after the injury. Counsel for the defendant thereupon requested that the answer be stricken out as not fairly responsive to the question and as embodying an admission which was not a part of the res gestæ and was inadmissible against the defendant. The request was denied, and the answer is relied upon now as showing negligence upon the part of the engineer. But in our opinion the answer cannot be considered. The admission attributed to the engineer was not a part of the res gestæ or in any wise binding upon the defendant. Vicksburg & Meridian R. R. Co. v. O'Brien, 119 U. S. 99, 104, 7 Sup. Ct. 118; 30 L. Ed. 299; Marande v. Texas & Pac. Ry. Co., 59 C. C. A. 562, 124 Fed. 42; National Masonic Ass'n v. Shryock, 20 C. C. A. 3, 73 Fed. 774. Nor was the answer so responsive to the question as to fall within the rule, sometimes applied, that one may not be heard to object to testimony which he himself has called forth; for the question related only to the time when the plaintiff conceived the idea that the engineer was negligent, and not to what prompted it. The answer therefore should have been stricken out, and, even although that was not done, the admission attributed to the engineer must be disregarded. Pitcairn v. Philip Hiss Co., 61 C. C. A. 657, 661, 125 Fed. 110.

We conclude that a verdict for the plaintiff could not have been sustained in any reasonably admissible view of the evidence, and therefore that no error was committed in directing a verdict for the defendant.

Complaint is made of the exclusion of two hypothetical questions put to the plaintiff; but, as they were not pertinent to the matters here discussed, their exclusion becomes immaterial.

A matter to which much attention was given by counsel is the asserted invalidity, or nonexistence as a law, of the purported statute of Colorado (Sess. Laws 1901, p. 161, c. 67), abrogating the fellow-servant rule of the common law; but that matter need not be considered, because there was no evidence of negligence on the part of the engineer, who was the only fellow servant whose conduct was in issue.

What has been said requires that the judgment be affirmed, and it is so ordered.