## J. T. HORTON v. SEABOARD AIR LINE RAILROAD COMPANY.

(Filed 28 May, 1913.)

1. **Master and Servant—Federal Employers' Liability Act—Interpretation of Statutes—Words and Phrases.**

   The Federal Employers' Liability Act abolishes contributory negligence as a defense and introduces the doctrine of comparative negligence, and provides that an "employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee": *Held,* that the act should be construed by the State courts in accordance with the Federal decisions; and the use of the term "any statutes" refers to Federal statutes enacted for the safety of employees, etc.

2. **Federal Employers' Liabiliy Act—Intent—Interpretation of Statutes—Contributory Negligence—Assumption of Risks.**

   Statutes should be construed as a whole to effectuate the intent of the lawmaking powers, and as to whether the Federal Employers' Liability Act, which abolishes contributory negligence as a defense, would permit the defense of assumption of risk, *Quære.*

3. **Same—Master and Servant—Negligence—Assumption of Risks—Safe Appliances — Notice — Continuing to Work — Reasonable Time.**

   An employer is negligent in failing to provide reasonably safe machinery and appliances for the employee to work with in the discharge of his duties, and to keep them in repair; the employee assumes the risk if he continues to work in the presence of a known defect without objection, but not that of the negligence of the employer: *Held,* this apparent conflict is reconciled by imposing upon the employee, if he desires to be relieved from assumption of risk, the duty of making complaint when he knows of a defect, or could discover it by the exercise of ordinary

HORTON *v*. R. R.

care, and by referring his conduct, when he does complain, to the principles of contributory negligence, at least for a reasonable time.

4. Same—Instructions—Harmless Error.

Where under the evidence the court correctly charged the jury as to the doctrine of assumption of risks, under the Federal Employers' Liability Act, if they found that the plaintiff had continued to work in the presence of a known danger from a defective appliance, furnished by defendant railroad company, without notifying it thereof, it is not error, of which the defendant can complain, that he also and erroneously charged them, as a distinct and separate proposition, that the plaintiff assumed the risk, although he objected, if he continued to work when a man of ordinary prudence would have seen that there was greater danger of being hurt than otherwise.

5. Instructions—Directed to Wrong Issues—Appeal and Error.

The refusal of prayers for instruction directed to issues inapplicable thereto are properly refused.

CLARK, C. J., concurs; BROWN, J., dissents.

APPEAL by defendant from *Ferguson, J.,* at October Term, 1912, of WAKE.

This is an action brought under the Federal Employers' Liability Act to recover damages for injury to the plaintiff's eye, caused by the explosion of a water glass on a locomotive engine.

The plaintiff, at the time of the injury, had been employed by the defendant as engineer for a period of six years, and as fireman for three or four years prior to his promotion.

The engine, No. 752, which plaintiff was operating, was equipped with a patented water glass, called the Buckner Water Glass, which was so constructed that a thick guard glass was placed over the front of the water glass to protect the eyes of the engineer in the event the inner glass should explode. The engine was also equipped with an alternative method of determining the amount of water in the boiler by means of gauge cocks.

The plaintiff was called on to take this engine 27 July, 1910, and on 4 August, 1910, while engaged in shifting cars at Apex, N. C., the water glass exploded and injured his eye. Imme-

diately after the explosion the fireman cut off the gauge glass
at top and bottom, and the engine was operated to Raleigh with
the gauge cocks as the means of determining the amount of
water in the boiler.

The guard glass referred to as part of the Buckner equip-
ment is a thick piece of glass 2 or 3 inches wide and 8 or 9
inches long, with a thickness of a quarter or three-eighths of
an inch, according to plaintiff's testimony, and is detached
from the gauge, being placed in slots arranged for the purpose
of holding it. The Buckner gauge is a brass tube, with an
opening in front and containing a small glass tube.

The plaintiff testified that "the shield or guard glass is im-
portant as a protection to the engineer's eyes; that is all it is
for." "I knew the shield was gone, and I knew it was put
there for the safety of anybody on the engine."

The plaintiff also testified that after taking out the engine
on 27 July, 1910, he returned on 28 July, 1910, and then told
the roundhouse foreman of the defendant, to whom reports of
defects ought to have been made, that the shield or guard glass
was gone, and he wanted one, and that the foreman replied
that they had none in stock; to run the engine as it was, and
he would send to Portsmouth and get him one; that he knew
there was some danger in operating without a shield or guard
glass, but that he was told by the foreman to go ahead without
it, and if he had not done so, he would have lost his job. The
foreman denied that any objection or complaint was made to
him.

There was evidence by the defendant tending to prove that
it was the duty of the plaintiff to shut off the water glass, when
he discovered the absence of the shield or guard glass, and to
run with the gauge cocks, and that this could be done without
danger and successfully.

The defendant requested the following instructions on the
issue as to assumption of risk, and excepted to the refusal to
give them as requested:

"1. The court charges you that if you believe the evidence
the plaintiff assumed the risks of the injury from the explosion
of the water glass, and you will answer the second issue 'Yes.'

HORTON *v.* R. R.

"2. The right of the plaintiff to recover damages in this action is to be determined by the provisions of the Federal Employers' Liability Act, enacted by Congress at the session of 1908, and the court charges you that if you find by a preponderance of evidence that the water glass on the engine on which plaintiff was employed was not provided with a guard glass, and the condition of the glass was open and obvious and was fully known to the plaintiff, and he continued to use such water glass with such knowledge and without objection, and that he knew the risk incident thereto, then the court charges you that the plaintiff voluntarily assumed the risk incident to such use, and you will answer the second issue 'Yes.'

"3. If you find by the greater weight of the evidence that the water glass was defective, and that the plaintiff knew of the condition of the water glass on the engine, and the danger incident to its use, and that there was open to him a safe way of operating the said engine by using the gauge cocks, and that he voluntarily used the water glass in operating the engine, the court charges you that the plaintiff assumed the risk of injury from the use of the water glass, and you will answer the second issue 'Yes.'

"4. If you answer the first issue 'Yes,' then the court charges you that if you find by the preponderance of the evidence that the plaintiff knew of the condition of the water glass on the engine and that he could have shut off the glass and operated his engine with safety by using the gauge cocks on the said engine, and that the plaintiff, with such knowledge, failed to shut off the glass and use the gauge cocks, then the court charges you that the plaintiff assumed the risk of injury, and you will answer the second issue 'Yes.'

"5. If you answer the first issue 'Yes,' then the court charges you that if you find by a preponderance of the evidence that the absence of the guard to the glass water gauge was open and obvious and was fully known to the plaintiff, and he continued to use the said glass with such knowledge, and that the plaintiff reported the defect and was given a promise to repair, and you further find that the plaintiff knew and appreciated the danger incident thereto, and that the danger was so obvious that a man

HORTON *v.* R. R.

of ordinary prudence would not have continued to use the gauge without the guard glass, then the court charges you that the plaintiff assumed the risk, and you will answer the second issue 'Yes.' "

The jury returned the following verdict:

1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint? Answer: Yes.

2. If so, did the plaintiff assume the risk of injury, as alleged in the answer? Answer: No.

3. Did the plaintiff by his own negligence contribute to his injury, as alleged in the answer? Answer: Yes.

4. What damages, if any, is the plaintiff entitled to recover? Answer: $7,500.

Judgment was entered upon the verdict, and the defendant excepted and appealed.

*Douglass & Douglass, W. B. Snow, J. W. Bunn, and R. N. Simms for plaintiff.*

*Murray Allen for defendant.*

ALLEN, J. This action is to recover damages under the Federal Employers' Liability Act, and the principal question raised by the appeal is as to the application of the doctrine of assumption of risk.

The act abolishes contributory negligence as a defense, and instead introduces the doctrine of comparative negligence, and it has the following provision as to assumption of risk:

"SEC. 4. That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to, or the death of, any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee."

It is contended by the defendant, and may be conceded, that the term "any statute" in the section quoted means any Federal statute, and that the assumption of risk is to be applied by a construction of the whole statute and under the rules laid down by the Supreme Court of the United States.

Statutes should receive such a construction as will accord with the legislative intention as gathered from the whole act (*McKee v. U. S.,* 164 U. S., 287), and when the act under consideration is so construed, it is at least debatable whether assumption of risk should be admitted as a defense in any action brought under its provisions. It says that contributory negligence on the part of the employee (that is, negligence which proximately causes the injury, because no other negligence is contributory) "shall not bar a recovery," and it would appear to be incongruous to admit as a defense assumption of risk which is based upon the fiction that the employee has assented to assume the risk of the particular injury, and when the facts relied on to prove assumption of risk generally enter into and are a part, but not all, of those necessary to sustain a plea of contributory negligence.

*Mr. Justice Holmes* considers the converse of this proposition in *Schlemmer v. R. R.,* 205 U. S., p. 1, in discussing a statute which abolished assumption of risk and admitted contributory negligence as a defense, and he points out the distinction between the two, and shows that the latter usually includes the former, and he also sounds the note of warning, which may well be applied here, that under statutes so framed one plea may be abolished by name and be reinstated under another name. He says: "Assumption of risk in this broad sense shades into negligence as commonly understood. Negligence consists in conduct which common experience or the special knowledge of the actor shows to be so likely to produce the result complained of, under the circumstances known to the actor, that he is held answerable for that result, although it was not certain, intended, or foreseen. He is held to assume the risk upon the same ground. *R. R. v. McDade,* 191 U. S., 64, 68. Apart from the notion of contract, rather shadowy as applied to this broad form of the latter conception, the practical difference of the two ideas is in the degree of their proximity to the particular harm. The preliminary conduct of getting into the dangerous employment or relation is said to be accompanied by assumption of the risk. The act more immediately leading to a specified accident is called negligent. But

the difference between the two is one of degree rather than of kind; and when a statute exonerates a servant from the former, if at the same time it leaves the defense of contributory negligence still open to the master (a matter upon which we express no opinion), then, unless great care be taken, the servant's rights will be sacrificed by simply charging him with assumption of the risk under another name."

In the case before us, to sustain the plea of assumption of risk, the defendant undertook to prove that the plaintiff continued at work, without objection, having a knowledge of the defect and apprehension of the danger, and to sustain the plea of contributory negligence it. relied on the same facts, and the additional one, that the plaintiff neglected to shut off the water glass and to use the gauge cocks.

But however this may be, we will consider the question presented from the standpoint of the defendant, and as we have not been referred to any Federal statute as to defective appliances, the violation of which contributed to the plaintiff's injury, we will assume that the defendant is entitled to the benefit of the doctrine of assumption of risk as declared by the Supreme Court of the United States, and will undertake to apply that doctrine to this case.

That Court enforces the rule that it is the duty of the employer to provide reasonably safe and adequate machinery and appliances for the use of the employee and to keep and maintain them in such condition, and that a failure to perform this duty is negligence. *Gardner v. R. R.,* 150 U. S., 349.

It also holds that the employee assumes the ordinary risks incident to his employment, and that if he continues to work, without objection, having knowledge of a defect and an apprehension of danger, and is injured, that this is one of the ordinary risks of his employment. *R. R. v. McDade,* 135 U. S., 570.

But it also holds that. negligence of the employer is an extraordinary risk, which the employee does not assume, the Court saying in *R. R. v. McDade,* 191 U. S., 67: "The servant assumes the risk of dangers incident to the business of the master, but not of the latter's negligence. The question of

assumption of risk is quite apart from that of contributory negligence. The servant has the right to assume that the master had used due diligence to provide suitable appliances in the operation of his business, and he does not assume the risk of the employer's negligence in performing such duties."

We have it then established that the employer is negligent if he fails to provide reasonably safe machinery and appliances, and to keep them in repair; that the employee assumes the risk if he continues to work in the presence of a known defect without objection, and that the employee does not assume the risk of the negligence of the employer.

There is some difficulty in applying these rules to a given case, because if it is the duty of the employer to repair, and a breach of that duty is negligence, and if the employee does not assume the risk of the negligence of the employer, it would seem to be contradictory to say that the employee may assume the risk of an injury caused by a failure to repair.

This apparent conflict is reconciled by imposing upon the employee, if he wishes to be relieved from assumption of risk, the duty of making complaint when he knows of a defect, or could discover it by the exercise of ordinary care, and by referring his conduct, when he does complain, to the principles of contributory negligence, at least for a reasonable time.

The decision in the leading case of *Hough v. R. R.*, 100 U. S., 216, which discusses particularly the assumption of the risk of the negligence of a fellow-servant, rests upon this principle. In that case the evidence tended to show that the engine of which deceased had charge, coming in contact with an animal, was thrown from the track over an embankment, whereby the whistle fastened to the boiler was blown or knocked out, and from the opening thus made hot water and steam issued, scalding the deceased to death; that the engine was thrown from the track because the cowcatcher or pilot was defective, and the whistle blown or knocked out because it was insecurely fastened to the boiler; that these defects were owing to the negligence of the company's master mechanic, and of the foreman of the roundhouse at Marshall; that to the former was committed the exclusive management of the motive power of

defendant's line, with full control over all engineers, and with unrestricted power to employ, direct, control, and discharge them at pleasure; that all engineers were required to report for orders to those officers, and under their direction alone could engines go out upon the road; that deceased knew of the defective condition of the cowcatcher or pilot, and having complained thereof to both the master mechanic and foreman of the roundhouse, he was promised a number of times that the defect should be remedied, but such promises were not kept; that a new pilot was made, but by reason of the negligence of those officers, it was not put on the engine; and the Court, after dis-. cussing the case of *Farwell v. R. R.*, 4 Met., 49, and stating that there are well defined exceptions to the general rule as to assumption of risk, says: "One, and perhaps the most important, of those exceptions arises from the obligation of the master, whether a natural person or a corporate body, not to expose the servant, when conducting the master's business, to perils or hazards against which he may be guarded by proper diligence upon the part of the master. To that end the master is bound to observe all the care which prudence and the exigencies of the situation require, in providing the servant with machinery or other instrumentalities adequately safe for use by the latter. It is implied in the contract between the parties that the servant risks the dangers which ordinarily attend or are incident to the business in which he voluntarily engages for compensation, among which is the carelessness of those, at least in the same work or employment, with whose habits, conduct, and capacity he has, in the course of his duties, an opportunity to become acquainted, and against whose neglect or incompetency he may himself take such precautions as his inclination or judgment may suggest. But it is equally implied in the same contract that the master shall supply the physical means and agencies for the conduct of his business. It is also implied, and public policy requires, that in selecting such means he shall not be wanting in proper care. His negligence in that regard is not a hazard usually or necessarily attendant upon the business. Nor is it one which the servant, in legal contemplation, is presumed to risk, for the obvious reason that the

servant, who is to use the instrumentalities provided by the master, has, ordinarily, no connection with their purchase in the first instance, or with their preservation or maintenance in suitable condition after they have been supplied by the master. . . . If the engineer, after discovering or recognizing the defective condition of the cowcatcher or pilot, had continued to use the engine, without giving notice thereof to the proper officers of the company, he would undoubtedly have been guilty of such contributory negligence as to bar a recovery, so far as such defect was found to have been the efficient cause of the death. He would be held, in that case, to have himself risked the dangers which might result from the use of the engine in such defective condition. But 'there can be no doubt that, where a master has expressly promised to repair a defect, the servant can recover for an injury caused thereby, within such period of time after the promise as it would be reasonable to allow for its performance, and, as we think, for an injury suffered within any period which would not preclude all reasonable expectation that the promise might be kept.' Shearman and Redf. Negligence, sec. 96; *Conroy v. Vulcan Iron Works,* 62 Mo., 35; *Patterson v. R. R.,* 76 Pa. St., 389; *Le Clair v. R. R.,* 20 Minn., 9; *Brabbitts v. R. R.,* 38 Mo., 289. 'If the servant,' says Mr. Cooley, in his work on Torts, 559, 'having a right to abandon the service because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless or until he makes his assurances good. Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume the risks,' " and the Court adds, with reference to contributory negligence: "We may add that it was for the jury to say whether the defect in the cowcatcher or pilot was such that none but a reckless engineer, utterly careless of his safety, would have used the engine without it being removed. If, under all the circumstances, and in view of the promises to remedy the defect, the engineer was not wanting in due care in continuing to use the engine, then the company will not be

excused for the omission to supply proper machinery, upon the ground of contributory negligence. That the engineer knew of the alleged defect was not, under the circumstances, and as matter of law, absolutely conclusive of want of due care on his part."

In *R. R. v. Ross,* 112 U. S., 382, after stating the rule as to assumption of risk by the employee, the Court says: "But however this may be, it is indispensable to the employer's exemption from liability to his servant for the consequences of risks thus incurred, that he should himself be free from negligence. He must furnish the servant the means and appliances which the service requires for its efficient and safe performance, unless otherwise stipulated; and if he fails in that respect, and an injury results, he is as liable to the servant as he would be to a stranger. In other words, whilst claiming such exemption, he must not himself be guilty of contributory negligence."

Again, in *R. R. v. Herbert,* 116 U. S., 652: "Where the employee is not guilty of contributory negligence no irresponsibility should be admitted for an injury to him caused by the defective condition of the machinery and instruments with which he is required to work, except it could not have been known or guarded against by proper care and vigilance on the part of his employer."

Running through all the cases is the idea that the employee assumes the risk, when he continues to work in the presence of a known defect, only when he fails to object.

The latest case we have found is *Brewery Co. v. Schmidt,* decided by the Supreme Court of the United States 2 December, 1912, in which the Court says: "The first point argued is that the defendant was entitled to judgment on the special findings, because the fourth was that the cooker at the time was not in such a bad condition that a man of ordinary prudence would not have used the same. But the eleventh was that the defendant did not use ordinary care in furnishing the cooker and in having it repaired, and the sixth, that the defendant promised the plaintiff that the cooker should be repaired as an inducement for him to continue using it. So it is evidence that the fourth finding meant only that the plaintiff was not negligent

in remaining at work. Whatever the difficulties may be with the theory of the exception (1 Labatt Master and Servant, ch. 22, sec. 423), it is the well settled law that for a certain time a master may remain liable for a failure to use reasonable care in furnishing a safe place in which to work, notwithstanding the servant's appreciation of the danger, if he induces the servant to keep on by a promise that the source of trouble shall be removed. *Hough v. R. R.,* 100 U. S., 213, 25 L. Ed., 612."

The text-books very generally declare the same doctrine.

"There is no longer any doubt that where a master has expressly promised to repair a defect, the servant does not assume the risk of any injury caused thereby within such a period of time after the promise as would be reasonably allowed for its performance, or, indeed, within any period which would not preclude all reasonable expectation that the promise might be kept." 1 Shearman and Redfield on Negligence, sec. 215, p. 372.

"It is also negligence for which the master may be held responsible, if, knowing of any peril, which is known to the servant also, he fails to remove it in accordance with the assurances made by him to the servant that he will do so. This case may also be planted on contract, but it is by no means essential to do so. If the servant, having a right to abandon the service because it is dangerous, refrains from doing so in consequence of assurances that the danger shall be removed, the duty to remove the danger is manifest and imperative, and the master is not in the exercise of ordinary care unless or until he makes his assurances good. Moreover, the assurances remove all ground for the argument that the servant, by continuing the employment, engages to assume its risks. So far as the particular peril is concerned, the implication of law is rebutted by the giving and accepting of the assurance, for nothing is plainer or more reasonable than that parties may and should, where practicable, come to an understanding between themselves regarding matters of this nature." Cooley on Torts, p. 1156.

"An obvious corollary from the principles explained in sec. 424, subds. a, b, *supra,* is that, as long as the period is running which is conceived to be covered by the promise, the defense of

an assumption of the given risk cannot be relied upon by the master. This doctrine is affirmed or taken for granted in all the decisions cited at the place referred to." Labatt Master and Servant, sec. 425.

In the note to *Miller v. Monument Co.*, 18 A. and E. Ann. Cases, 961, there is a very full citation of authority upon the distinction between assumption of risk and contributory negligence, which it is necessary for us to consider further, as the case is presented, and in the note to *Foster v. R. R.*, 4 A. and E. Ann. Cases, 153, the editor, in dealing with the effect of a promise to repair on assumption of risk, cites decisions from thirty-five States, and others from the Federal courts, including the *Hough case*, in support of the statement that, "It is a well settled general rule that the assumption of risk implied from a servant's knowledge that a tool, instrument, appliance, piece of machinery, or place of work is defective or dangerous, is suspended by the master's promise to repair, made in response to the servant's complaint, so that if the servant is induced by such promise to continue at work, he may recover for an injury which he sustains by reason of such defect within a reasonable time after the making of the promise, provided he exercises due care, unless the defect renders the appliance so imminently dangerous that a prudent person would decline to use it at all until it was repaired," and this last contingency is dealt with in the *Hough case, supra,* under contributory negligence.

Applying these principles to the evidence, we are of opinion that the charge of his Honor was favorable to the defendant, upon the issue of assumption of risk.

The plaintiff took charge of the engine on 27 July, 1910, and was injured while operating it on 4 August, 1910.

He testified, among other things, that he discovered the absence of the guard glass on his first trip out, and that upon his return on the next day he told the roundhouse foreman, to whom complaint ought to have been made, and whose duty it was to repair, that the guard glass was gone, and asked if he had one, and that the foreman replied, "they did not keep them in stock here; that they were made in Portsmouth, and he would have to send to Portsmouth to get one; to run her like

she was. He said he would send to Portsmouth and get me one"; that he had the talk with the foreman between 3 and 5 o'clock, and told him the shield or guard glass was gone, and he wanted one, and that the foreman said he had none in stock, and to run the engine as it was and he would send to Portsmouth and get him a shield or guard glass; that he knew there was some danger, but that he was told by the foreman to go ahead and operate without the shield, and if he had not done so, he would have lost his job.

The foreman denied that any complaint was made to him.

In this conflict of evidence it was for the jury to determine the fact, and upon this phase of the case his Honor, among other things, charged on the second issue as to assumption of risk as follows: "On the other hand, the employer has the right to assume that his employee will go about his work in a reasonably safe way and give due regard to the machinery and appliances which are in his hands and under his control, and if you should find from the evidence, by its greater weight (because the burden in this instance is on the defendant), that the plaintiff knew of the absence of the guard or shield to the water gauge, and failed to give notice to the defendant or to the agent whose duty it was to furnish the water gauge and appliance, and he continued to use it without giving that notice, it being furnished to him in a safe condition, then he assumed the risk incident to his work in the engine with the glass water gauge in that condition, although he might have handled his engine in every other respect with perfect care. If it was not received in good condition, and he failed to give notice, and if he did work with it in its present condition, without the shield or guard, he then assumed the risk. How was that? It is a question of evidence for you. Did he give the notice? Did he assume the risk by failing to give notice, keeping the knowledge of the absence of the guard glass within his own breast?

"But if you find that he gave notice to the foreman of the roundhouse, and if you should find that the use of the water gauge was not so obviously dangerous that a reasonably prudent man, careful of himself not to get hurt, while he was about

his work, and went on and used it, he would not assume the risk; but if the danger was so apparent that a reasonably prudent man, careful of himself not to receive injury, would see that he was in imminent danger and would observe by the use of it that he was endangering himself by going on and working with it, and he continued to work with it, he would be assuming the risk and responsibility, and it would be your duty to answer that issue 'Yes.' If it was so obviously dangerous that a reasonably prudent man would not use it, and he continued to use it instead of using the other, he would assume the risk."

It therefore appears that the defendant not only had the benefit of the rule that the employee assumes the risk if he works in the presence of a known danger without objection, but in addition, and as a distinct and separate proposition, that the plaintiff assumed the risk, although he objected, if he continued to work when a man of ordinary prudence would see that there was greater danger of being hurt than otherwise, which would not be assumption of risk, but evidence of contributory negligence.

The third, fourth, and fifth prayers for instructions were properly refused, because directed to the second issue, instead of to the third, to which they were applicable.

We have thus far considered the case under the decisions of the Federal court. If we applied the provisions of the Fellow-servant Act of this State, as construed by our Court, there could be no issue as to assumption of risk. *Coley v. R. R.,* 129 N. C., 407.

We have not been inadvertent to the other exceptions appearing in the record, seventy-two in number, but have examined them with care, and find no reversible error.

No error.

CLARK, C. J., concurs, on the further ground that the following paragraph in section 4 of the Federal Employers' Liability Act, "Such employee shall not be held to have assumed the risk of his employment in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee," merely

emphasizes the fact that in such cases there is no assumption of risk. It cannot be construed, fairly, to be an implied provision that assumption of risk is a defense in all other cases.

Besides, assumption of risk lies in contract, and under the provision of Revisal, 2646, "Any contract or agreement, expressed or implied, made by any employee of such company to waive the benefit of this section shall be null and void," it has been repeatedly held that the doctrine of assumption of risk has been eliminated by this section. *Biles v. R. R.,* 143 N. C., 78; *Thomas v. R. R.,* 129 N. C., 392; *Cogdell v. R. R.,* 129 N. C., 398; *Coley v. R. R.,* 128 N. C., 534. Such contract, therefore, being null and void under our statute, it cannot be a defense, which depends upon the validity of such contract.

BROWN, J., dissenting: The evidence in this case tended to establish the following facts:

The plaintiff, at the time of the injury, had been employed by the defendant as engineer for a period of six years, and as fireman for three or four years prior to his promotion. It appeared from the work reports, identified by the plaintiff, that he first made a report on this engine on 28 July, after his return from a round trip requiring two days. The explosion of the water glass, of which he complains, occurred 4 August, upon his return from the third or fourth trip to Aberdeen. At the time of the explosion plaintiff was looking at the glass.

The engine, No. 752, which plaintiff was operating, was equipped with a patented water glass, which was so constructed that a thick guard glass was placed over the front of the water glass to protect the eyes of the engineer in the event the inner glass should explode. The engine was also equipped with an alternative method of determining the amount of water in the boiler by means of gauge cocks.

It was the plaintiff's duty, upon boarding the engine, to look at his water glass, and test his gauge cocks, the latter being three cocks placed at intervals on the front of the boiler, in order to see that both were in working order.

On the morning plaintiff was called to take this engine (he had prior to that time been operating a passenger train) and

use it in operating a freight train from Raleigh, N. C., to Aberdeen, N. C., he noticed before leaving Raleigh that there was no shield or guard on the water glass. Without making complaint of the condition of the glass, plaintiff made the trip to Aberdeen and return. Upon his arrival in Raleigh at the end of his round trip, he made a written report of the condition of his engine upon forms provided for that purpose, and in accordance with the defendant's requirements he placed the reports on a file in the roundhouse or put them in a box there for that purpose. This, according to the plaintiff's evidence, was the way provided by the company for procuring repairs.

George Steele, plaintiff's witness, and a number of defendant's witnesses, said that these work reports were required to be in writing, that they were filed and distributed among the workmen for the purpose of making the required repairs.

It appears in evidence that plaintiff made a written report on this engine at the return of each round trip, and *noted every defect in his engine except the absence of the guard glass.* When asked by the superintendent of the division on which he was employed why he failed to report the absence of the guard, he said that *it was for reasons best known to himself.*

On 4 August, 1910, while engaged in shifting cars at Apex, N. C., the plaintiff testified that the water glass exploded and injured his eye. Immediately after the explosion he cut off the gauge glass at top and bottom, and the engine was operated to Raleigh with the gauge cocks as the means of determining the amount of water in the boiler.

The guard glass referred to as part of the Buckner equipment is a thick piece of glass 2 or 3 inches wide, and 8 or 9 inches long, with a thickness of a quarter or three-eighths of an inch, and is detached from the gauge, being placed in slots arranged for the purpose of holding it. The Buckner gauge is not a complicated piece of machinery, but is a brass tube with an opening in front and containing a small glass tube. A thick piece of glass or two thin pieces of the proper size could be cut and placed in the slot and would serve the purpose of a guard glass.

Plaintiff testified that after he returned from the first trip to Aberdeen, he ran the engine to the coal chute track, or track opposite the turntable, and told Mr. Matthews, the roundhouse foreman, that the guard glass was gone, and asked him if he had one. "He said they did not keep them in stock here, but they were made in Portsmouth, and that he would have to send to Portsmouth to get one; to run her like she was. He said he would send to Portsmouth and get me one. After Mr. Matthews told me he did not have any, I went to Charlie Murray, the glass cutter for the Baker-Thompson Lumber Company, and told him I wanted him to make me a guard glass, and gave him the measurements."

The conversation with Matthews, testified to by plaintiff, occurred on 28 July. Plaintiff's work reports show that he made two round trips with this engine after that time and before his injury.. The accident occurred 4 August, six days after the conversation with Matthews, and during that time plaintiff was aware of the defective condition of the water glass and knew that it had not been repaired.

Matthews denied that he told plaintiff the guard glasses were kept in Portsmouth, and to go ahead and run his engine and that he would send and get one. He said he had no recollection of having a conversation with Horton.

Plaintiff's testimony leaves no doubt of the fact that he was fully aware of the danger of using the water gauge without the protection of the guard glass.

George Steele, a witness for plaintiff, explained the duties of an engineer as follows: "I have been an engineer on the Seaboard six or eight years. I am familiar with the duties of an engineer. It is his duty to see that his engine is in proper working order and properly equipped. He reports thirty minutes beforehand for that purpose. He is paid for that time. He is paid until he gets off duty.. He is allowed fifteen or twenty or twenty-five minutes from the time he cuts loose from his train.

"Engineers are supposed to inspect engines before they give them up, and make out a work report in writing. It is required by the company to be in writing and signed by the engineer.

That work report is filed in the roundhouse, and the work distributed among different ones to have the defects remedied. It is the engineer's duty to report defects discovered in his cab and report them on his work report. When an engineer gets on his engine in the morning he tests the gauge cocks to see that they are working. He tests his gauge glass to see that it is in shape and in working order.

"The gauge cocks indicate how much water is in the boiler. You could operate the engine with gauge cocks alone, without the water glass. The water glass is arranged so that if anything should happen you could cut it off, top and bottom; that cuts it clean out, so that it is impossible for it to explode. But with the steam on and the water on, and this guard glass gone, that inner tube is nothing but a thin tube of glass. Whatever pressure the engine carries is on there. Those glasses explode frequently. Nobody can tell when one is going to explode. One might last fifteen minutes and one thirty days. One has never exploded with me. They buzz a little when they are going to explode. The purpose of the guard glass is to protect anybody in the cab. It protects the engineer from explosion. Without the guard glass, he is liable to be injured by flying glass.

"On the line of road, if I discovered the guard glass was gone, I would report it in writing on the work report when I got in. It could be gotten by requisition from the storeroom. My duty would be to notify the foreman. It is the engineer's duty to report any defects they can see on the engine in writing."

At the conclusion of the evidence, defendant moved for judgment of nonsuit upon the ground that plaintiff's evidence showed that he assumed the risk of injury from the explosion of the water glass. I think this motion should have been allowed. If it is true, as testified by plaintiff, that he reported the defect and was given a promise to repair, his testimony shows that he continued to use the defective water glass when the danger was so imminent that a man of ordinary prudence would not have used it, and in doing so he continued to assume the risk of injury.

The Federal questions in this case are properly raised, and in order to dispose of the appeal it is necessary that they should

be passed upon by this Court. The construction of the National Employers' Liability Act is involved, which is in itself sufficient to give jurisdiction to the Supreme Court of the United States if the case should be taken to that court. *R. R. v. Wolfe,* 33 Sup. Ct. Rep., 135. In an action brought by an employee against a carrier for an injury sustained while engaged in interstate commerce, the Federal act is supreme. Congress having acted, the competency of the State to regulate the mater is withdrawn, and all State legislation on the subject is superseded. *Mondou v. R. R.,* 223 U. S., 1. The right of action created by this act is exclusive, and the employee has no right of action either at common law or under State statutes regulating the relation of master and servant. *R. R. v. Wolfe, supra.*

The plaintiff in the case before us brought his suit under the Federal act, and the defendant admitted that act to be controlling, and pleaded as a defense plaintiff's contributory negligence and assumption of risk. The defendant takes the position that assumption of risk as a defense is affected by the Federal act only to the extent of being abolished in cases where the violation by the carrier of some statute enacted for the safety of employees contributed to the injury; that in other respects the defense of assumption of risk is unaffected, and is to be determined by the principles of the common law as interpreted by the United States Supreme Court.

Section 4 of the act provides: "That in any action brought against any common carrier under or by virtue of any of the provisions of this act to recover damages for injuries to or the death of any of its employees, such employee shall not be held to have assumed the risks of his employment in any case where the *violation by such common carrier of any statute enacted for the safety of employees* contributed to the injury or death of such employee."

The legislative history of this act, which is a proper aid to its construction (11 Enc. U. S. Supreme Courts Reports, 143), shows the clear intention of Congress to modify the common-law defense of assumption of risk only to the extent shown by this section. The act of 1906, which was held unconstitutional,

contained no reference to assumption of risk. The act of 1908, as introduced in Congress, provided in section 6 that the employee "shall not be held to have assumed the risk of his employment in any case where the violation of law by such common carrier contributed to the injury or death of such employee."

Before the passage of the act, this broad language was changed to read "where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee." By incorporating this section in the act, I think Congress indicated clearly that it did not regard the defense of assumption of risk as having been abolished by the other provisions of the act, and did not intend the act to have such effect.

In *Freeman v. Powell,* 144 S. W., 1033, it is expressly held that assumption of risk is a defense to an action brought under this act, and the language of the Supreme Court of the United States, 223 U. S., at pages 49 and 50, leads me to conclude that in the opinion of that Court assumption of risk will bar the right of a plaintiff to recover unless the negligence of the master consists in the violation of a Federal statute enacted for the servant's safety. The fact that contributory negligence is abolished as a complete defense by section 3 of the act can have no effect on the defense of assumption of risk. The two defenses are separate and distinct. In the case of *Schlemmer v. R. R.,* 205 U. S., page 1, quoted by *Mr. Justice Allen* as sounding a note of warning that one plea may be abolished by name and reinstated under another name, four justices dissented, and when the case again came before the Court, *Mr. Justice Day,* who had formerly dissented, wrote the opinion of the Court, holding that a statute abolishing assumption of risk did not affect the defense of contributory negligence. The converse of this proposition sustains the view that a statute which abolishes contributory negligence has no effect upon the defense of assumption of risk.

It is not contended in this case that the defendant has violated any statute enacted for the safety of employees, and, therefore, assumption of risk, if established, would operate to

defeat the plaintiff's cause of action. The court below accepted this as a correct construction of the Federal act, and submitted the following issues:

1. Was the plaintiff injured by the negligence of the defendant, as alleged in the complaint?

2. If so, did the plaintiff assume the risk of injury, as alleged in the answer?

3. Did the plaintiff by his own negligence contribute to his injury, as alleged in the answer?

4. What damage, if any, is the plaintiff entitled to recover?

Having submitted an issue of assumption of risk, his Honor was confronted with the question whether such assumption of risk should be determined by the principles announced by this Court or by the decisions of the Supreme Court of the United States.

It is clear that the decisions of the two jurisdictions are in conflict. The trial judge followed the decisions of this Court, and however correct they may be when applied to a cause of action arising under the State law, I think our decisions are contrary to those of the Supreme Court of the United States and are not controlling in this action. The charge cannot be read without reaching the conclusion that his Honor regarded the law of North Carolina as controlling.

He said: "Plaintiff has brought this suit under the United States statute, and where Congress enacts a law within the limits of its power, that law should be enforced uniformly throughout the entire United States. If it is in conflict with the State law, the State law is superseded, but where there is no conflict expressed by the statute of the United States, then the rule of the State prevails.

"And in this act under which this suit is brought, it is provided that any action brought against any common carrier under and by virtue of any of the provisions of this act to recover damages for injuries to or death of any of its employees, such employee shall not be held to have assumed the risk of his employment in any case where the violation by such a carrier of any statute enacted for the safety of employees contributed to the injury or death of such employees.

"There has been no statute provided as applies to this glass water gauge. which has been called to the attention of the Court, so that leaves it open to the rights which the plaintiff might have under the law of this State, and the question of assumed risk, as has been argued by one, if not more, of counsel, grows out of the contractual relations between plaintiff and defendant."

The following instructions, which are not quoted in the opinion of the Court, were given over defendant's objection and exception:

"A man assumes the risk, when he takes employment, incident to the class of work which he has to perform.

"Some classes of work are more dangerous than others. The position of a locomotive engineer might well be regarded as more hazardous than other employments; therefore, he assumes the risk of that character of employment; but he has the right when he enters into employment of that class of work to assume that his employer has done what the law requires it to do in providing him a reasonably safe place to work, with reasonably safe appliances with which to do his work, consistent with the character of the work which is to be performed.

*"He does not assume the risk incident to the negligence of his employer in providing machinery and appliances with which he has to work."*

And in another part of the charge, this language is used:

"And the same rule applies, if the use of the glass without the shield was not so obviously dangerous as to cause a reasonably prudent man to stop the use of it, his going on and using it, of itself, would not be assuming the risk in the use of it.

"If it was so obviously dangerous that a reasonably prudent man would not use it, and he continued to use it instead of using the other, he would assume the risk."

The instructions quoted in the Court's opinion, which it is said properly present the defendant's contention that by continuing to work in the face of a known danger plaintiff assumed the risk of injury, are made dependent upon a finding by the jury that the guard glass was furnished to the plaintiff *in a safe condition.*

It will be found that the instructions read: "If it was received in good condition and he failed to give notice, and if he did work with it in its present condition without the shield or guard glass, he then assumed the risk." Such limitation is improper.

Whether the danger existed at the time plaintiff undertook the operation of the engine, or arose while he was engaged in its operation, is immaterial. If it was furnished him in a defective condition, and he became aware of the existence of the defect and continued to work without objection and a promise to repair, he assumed the risk.

The jury had been instructed positively that the servant does not assume the risk incident to the negligence of the master in providing machinery and appliances with which he has to work, and in carrying out this view the Court makes assumption of risk dependant upon the defendant's having furnished the glass in a safe condition. Plaintiff testified that when the engine was turned over to him the guard glass was defective. If the jury believed this evidence, it was impossible to find that he assumed the risk as set forth in his Honor's instructions.

The doctrine of assumed risk as adopted by this Court is stated in *Hicks v. Manufacturing Co.*, 138 N. C., 319, as follows: "An employee will not be deemed to have assumed the risk from the fact that he works on in the presence of a known defect, unless the danger be so imminent that no man of ordinary prudence and acting with such prudence would incur the risk which the conditions disclose." And this Court has repeatedly said that the servant never assumes the risk incident to the negligence of the master in providing machinery and appliances with which he has to work.

The jury in this case was instructed in practically the exact language of our decisions. The Supreme Court of the United States has held in a uniform line of decisions, which I shall refer to later, that the servant does assume the risk of injury resulting from the negligence of the master when the danger is known to the servant and appreciated by him, and he continues to work in the face of such danger without objection.

The defendant requested the following instructions:

"The court charges you that if you believe the evidence, the plaintiff assumed the risk of injury from the explosion of the water glass, and you will answer the second issue 'Yes.'

"The court charges you that the statute of North Carolina, Revisal, sec. 2646, abolishing assumption of risk as defense to an action brought against a railroad company by one of its employees, has no application in this case, and if you find that the plaintiff assumed the risk of injury from the explosion of the water glass, you will answer the second issue 'Yes.'

"The right of the plaintiff to recover damages in this action is to be determined by the provision of the Federal Employers' Liability Act, enacted by Congress at the session of 1908, and the court charges you that if you find by a preponderance of evidence that the water glass on the engine on which plaintiff was employed was not provided with a guard glass, and the condition of the glass was open and obvious and was fully known to the plaintiff, and he continued to use such water glass with such knowledge and without objection, and that he knew the risk incident thereto, then the court charges you that the plaintiff voluntarily assumed the risk incident to such use, and you will answer the second issue 'Yes.' "

The court gave this instruction as applicable to the issue of contributory negligence, and instead of the words, "then the court charges you that the plaintiff voluntarily assumed the risk incident to such use, and you will answer the second issue 'Yes,' " used the words, "then the court charges you that the plaintiff was guilty of contributory negligence, and you will answer the third issue 'Yes.' "

"If you find by the greater weight of the evidence that the water glass was defective, and that the plaintiff knew of the condition of the water glass on the engine and the danger incident to its use, and there was open to him a safe way of operating the said engine by using the gauge cocks, and that he voluntarily used the water glass in operating the engine, the court charges you that the plaintiff assumed the risk of injury from the use of the water glass, and you will answer the second issue 'Yes.' "

The court refused these requests for instruction.

His Honor's charge ánd the defendant's requests for instruction, particularly the second request quoted, present the conflicting views of the doctrine of assumption of risk. The defendant contends that the requested instructions are in accord with, and the charge as given in conflict with, the decisions of the Supreme Court of the United States.

In this I think the defendant is correct. The common-law conception of assumption of risk is still the prevailing doctrine in the great majority of the State courts and in the United States courts. Labatt on Master and Servant says:

"The doctrine applied in the older English cases and in all the American cases up to the present time, with a few possible unimportant exceptions, is that, in the case of all adult servants, except seamen, the actions must be declared not to be maintainable, as a matter of law, if the evidence leaves no reasonable doubt that the servant comprehended the abnormal risk which caused his injury." (Page 7.)

"The doctrine that a servant who has no knowledge, actual or constructive, of an ordinary risk is not chargeable with its assumption, is implied in every jurisdiction in which the principles of the common law are recognized. The logical converse of this doctrine, viz., that a servant is to be regarded as having assumed extraordinary risk of which he had, or ought to have obtained, knowledge before his injury was received, was also applied universally until comparatively recent times, and is still the prevailing rule in the United States." (Sec. 274.)

In support of the above text, the author cites the English cases and decisions of the Supreme Court of the United States and the Federal circuit and district courts and the courts of Alabama, Arkansas, California, Colorado, Connecticut, Delaware, District of Columbia, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Jersey, (North Carolina does not appear), Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, Tennes-

see, Texas, Utah, Vermont, Virginia, Washington, West Virginia, and Wisconsin. See, also, Labatt, secs. 271, 174a, 276, and 280, and pages 632, 633, 640, and 641.

"In all the English cases decided before the passage of the Employers' Liability Act, the courts proceeded upon the hypothesis that an assumption of an extraordinary risk was properly inferred, as a matter of law, from the mere fact that the servant accepted or continued in the employment with a knowledge of its existence and a full comprehension of the enhanced danger to which he was exposed." (Sec. 280.)

Judge Thompson in his work on Negligence says that if a servant, with knowledge of a defect in a machine which he is employed to operate, continues in the employment without objection or complaint, he is deemed to assume the risk of the danger; that this doctrine is so plain that it could hardly be made plainer by multiplying special statements and explanations. (Sections 4608, 4609.) "It is a part of this doctrine." Judge Thompson says in another section (4707), "that the servant assumes the risks of known defects in machinery, tools. appliances, etc., or of improper appliances furnished for the performance of a particular task, or where no proper appliances are furnished, although the defect or danger results from the negligence of the master, or from his violation of a statute or a municipal ordinance."

In *Butler v. Frazee,* 211 U. S., 459, it is held that "One understanding the condition of machinery and dangers arising therefrom, or who is capable of doing so, and voluntarily, in the course of employment, exposes himself thereto, assumed the risk thereof, and if injury results cannot recover against the employer."

In *R. R. v. Archibald,* 170 U. S., at pages 671 and 672, *Mr. Justice White* (now *Chief Justice*) says: "The elementary rule is that it is the duty of the employer to furnish appliances free from defects discoverable by the exercise of ordinary care, and that the employee has a right to rely upon this duty being performed. Whilst in entering the employment he assumes the ordinary risks incident to the business, he does not

assume the risk arising from the neglect of the employer to perform the positive duty owing to the employee with respect to appliances furnished.

"An exception to this general rule is well established, which holds that where an employee receives for use a defective appliance, and with knowledge of the defect continues to use it without notice to the employer, he cannot recover for an injury resulting from the defective appliance thus voluntarily and negligently used. . . . The employee is not compelled to pass judgment on the employer's methods of business or to conclude as to their adequacy. He has a right to assume that the employer will use reasonable care to make the appliances safe, and to deal with those furnished relying on this fact, subject, of course, to the exception which we have already stated, by which when an appliance is furnished an employee in which there exists a defect known to him, or plainly observable by him, he cannot recover for an injury caused by such defective appliance if, with the knowledge above stated, he negligently continues to use it."

The very case relied upon by the Court to sustain the statement that a servant does not assume the risk arising from the master's negligence refers to the well established exception that the servant does assume the risk of injury resulting from the negligence of the master when the conditions brought about by such negligence are known to the servant and the danger appreciated. *R. R. v. McDade,* 191 U. S., 67.

In *R. R. v. Shalstrom,* 195 Fed., 729, it is said: "Although the risk of the master's negligence and of its effect unknown to the servant is not one of the ordinary risks of the employment which he assumes, yet if the negligence of the master or its effect is known and appreciated by the servant, or is obvious, or 'so patent as to be readily observed by him by the reasonable use of his senses, having in view his age, intelligence, and experience,' and he enters and continues in the employment without objection, he elects to assume the risk of it, and he cannot recover for the damages it causes," citing *R. R. v. Archibald, supra.*

A very comprehensive review of the authorities on this question will be found in *Cordage Co. v. Miller,* 126 Fed., 508, in

which *Judge Sanborn* says: "The authorities and opinions to which reference has now been made have forced our minds irresistibly to the conclusion that the following rules of law have become irrevocably settled by the great weight of authority in this country and by the opinions of the Supreme Court, which, upon well settled principles, must be permitted to control the opinions and actions of this Court:

"A servant by entering or continuing in the employment of a master assumes the risks and dangers of the employment which he knows and appreciates, and also those which an ordinarily prudent person of his capacity and intelligence would have known in his situation.

"A servant who knows, or who by the exercise of reasonable prudence and care would have known, of the risks and dangers which arose during his service, but who continues in the employment without complaint, assumes those risks and dangers to the same extent that he undertakes to assume those existing when he enters upon the employment.

"Among the risks and dangers thus assumed are those which arise from the failure of the master to completely discharge his duty to exercise ordinary care to furnish the servant with a reasonably safe place to work and reasonably safe appliances and tools to use.

"Assumption of risk and contributory negligence are separate and distinct defenses. The one is based on contract, the other on tort. The former is not conditioned or limited by the existence of the latter, and is alike available whether the risk assumed is great or small, and whether the danger from it is imminent and certain or remote and improbable.

"The court below fell into an error when it instructed the jury that, although the plaintiff continued in the employment of the defendant by the side of the visible unguarded gearing, with full knowledge that the cogs which injured her were uncovered, still she could not be held to have assumed the risk of working by their side unless the danger from them was so imminent that persons of ordinary prudence would have declined to incur it under similar circumstances."

In *Kyner v. Mining Co.,* 184 Fed., 43, *Mr. Justice Vandevanter,* who was then circuit judge, says: "As respects the

first specification of negligence, it conclusively appeared that the absence of the guard about the drum and lower cable was so patent as to be readily observed; that the enhanced danger arising therefrom was so obvious that its appreciation by the plaintiff was unavoidable in view of his years, intelligence, and experience, and that under those conditions he voluntarily continues to work about the drum and cable. So, even if the absence of the guard was a negligent omission on the part of the defendant, the court was bound to rule as a matter of law that the plaintiff assumed the risk," citing *Butler v. Frazee,* 211 U. S., 459.   See, also, *Brick Co. v. Miller,* 181 Fed., 830; *Katalla v. Rones,* 186 Fed., 30.

It is useless to multiply authorities, because the standard by which assumption of risk will be measured in construing the Federal act is indicated by the language of *Mr. Justice Vandevanter* in *Mondou v. R. R.,* 223 U. S., pages 49 and 50.

In referring to the departures from the common law made by the act, he says: "The rule that an employee was deemed to assume the risk of injury, even if due to the employer's negligence, where the employee voluntarily entered or remained in the service with an actual or presumed knowledge of the conditions out of which the risk arose, is abrogated in all instances where the employer's violation of a statute enacted for the safety of his employees contributed to the injury."

I think his Honor clearly fell into error prejudicial to the defendant in his instruction on the issue of contributory negligence. It is true that issue was answered in favor of the defendant, but the court gave the jury the right to answer that issue in the affirmative upon the finding of facts that clearly entitled the defendant to have the second issue answered in its favor.   His Honor confused contributory negligence and assumption of risk in such manner as to be misleading.   Referring to the issue of contributory negligence, he says:

"That is governed largely by the same rules as applied to the question of assumption of risk.  Did he continue to use the glass gauge when it was so obviously dangerous that a reasonably prudent man careful of himself would not do it?  Was the danger so apparent that a reasonably prudent man would cease to use that, and use the other gauge?  If so, it would be your duty to answer the third issue 'Yes.'

"But if the danger was not so obvious. that a reasonably prudent man, careful of himself, would not realize the danger of using the water glass, and he continued to use it, he would not be guilty of contributory negligence.

"If you find by the preponderance of the evidence that the water glass by which plaintiff was injured was not provided with a guard glass, and the condition of the water glass was open and obvious and was fully known to the plaintiff, and he continued to use such water glass with such knowledge and without objecting, and knew the risk incident thereto, then the court charges you that the plaintiff was guilty of contributory negligence, and you should answer the third issue 'Yes.'" ·

In *Schlemmer v. R. R.,* 220 U. S., 590, it is held that: "There is a practical and clear distinction between assumption of risk and contributory negligence. By the former the employee assumes the risk of ordinary dangers of occupation and those dangers that are plainly observable; the latter ·is the omission of the employee to use those precautions for his own safety which ordinary prudence requires." *R. R. v. McDade,* 191 U. S., 64; Labatt on Master and Servant, pages 747, 749, 767, and 772.

I do not think the opinion of the Court in this· case is sound in assuming that if plaintiff gave notice of the absence of the guard glass that alone would be sufficient to relieve him from the charge of assumption of risk. The authorities hold that there must be a complaint and promise to repair, and it must appear that the servant continued to work relying upon the promise. Labatt on Master and Servant, secs. 418-419, and cases cited; *Dailey v. Fiberloid Co.,* 186 Mass., 318; *Hood v. Packing Co.,* 133· S. W., 446.

In discussing the standard by which assumption of risk must be measured in our case, the Court starts out with the statement that a servant never assumes the risk of the negligence of the master, and ends with the authorities to the effect that "the assumption of risk implied from a servant's knowledge that a tool, instrument, appliance, piece of machinery, or place of work is defective or dangerous is suspended by the master's promise to repair."

Without regard to a promise to repair, the court below instructed the jury that a servant does not assume the risk of injury from danger created by the negligence of the master, and he refused to instruct the jury thàt if plaintiff continued to use the water glass with knowledge of its defective condition and without objection, and knew the risk incident thereto, he assumed the risk of injury.

To say that the employee assumes the risk if he continues to work in the presence of a known danger without objection, and the employee does not assume the risk of the master's negligence, is to assert a proposition and· deny it in the same sentence. Yet in the opinion of this Court these two propositions are said to be established by the decisions of the Supreme Court of the United States.

This conflict is noted and is said to be reconciled by imposing upon the employee, if he wishes to be relieved from assumption of risk, ·the duty of making complaint when he knows of a defect or could discover it by the exercise of ordinary care, and by referring his conduct, when he does complain, to the principles of contributory negligence, at least for a reasonable time.

In my opinion, this does not reconcile the conflict, because if the servant does not assume the risk of the negligence of ·the master, it can make no difference whether he makes complaint of the defect or not. If the defect resulted from the negligence of the master, and the risk is not assumed, what is ·the·necessity for making complaint?

The *Hovgh case,* which the Court says explains this anomaly, is based upon the assumption that there was a complaint by the employee and a promise to repair, and under such circumstances the burden of the risk is shifted to the màster fòr a reasonable time, unless the danger is so obvious that a man of ordinary prudence would not continue to work in the face of it, in which event the assumption of the risk remains with the servant in spite of the complaint and promise.

In our case the evidence of the complaint· and promise to repair was in direct conflict, and the instructions requested by the defendant were based upon the jury's finding that the plaintiff had not complained of the condition of the water glass.

In any view of the charge of the court, there are conflicting instructions on material points, and under such circumstances this Court, should direct another trial. *Williams v. Haid,* 118 N. C., 481; *Edwards v. R. R.,* 129 N. C., 78; *Westbrook v. Wilson,* 135 N. C., 402.