JAMES T. HORTON v. SEABOARD AIR LINE RAILWAY COMPANY.

(Filed 12 May, 1915.)

**1. Master and Servant—Railroads—Safe Place to Work—Unusual Dangers— Defects—Promise to Repair—Continuing to Work—Assumption of Risks— Evidence—Instructions.**

The plaintiff was injured while engaged in the performance of his duties as defendant railroad company's locomotive engineer, caused by the explosion of a water-glass placed in his cab, as a part of the appliances of the locomotive to show the quantity of water in the boiler. There was evidence tending to show that a guard glass to the water gauge was missing, which was used for the purpose of protecting engineers from injury of the character inflicted in this case; that plaintiff notified the proper official of the defendant that it was gone, asked for another, and was informed that there were none in stock, but one would be gotten from Portsmouth. This having been decided in the United States Supreme Court on *certiorari*, 233 U. S., 492, a new trial awarded defendant, from which the present appeal comes, it is *Held*, that the case was properly tried on the principles therein declared, and no error was committed by the trial judge in his instruction to the jury, in substance, that the employee does not assume risks of a dangerous occupation not naturally incident thereto until he becomes aware of the defect or disrepair, or unless a man of ordinary prudence under the circumstances would have observed and appreciated the unusual danger; that if he continues work under the master's promise to repair for a time reasonably necessary to make it, he does not assume the risk of his employment unless the danger be so imminent that no ordinarily prudent man would continue therein under the promise to repair.

**2. Court's Discretion—New Trials—Newly Discovered Evidence—Appeal and Error.**

The refusal of the trial judge to grant a new trial for newly discovered evidence is a matter within his discretion and not ordinarily reviewable on appeal.

WALKER, J., concurring; BROWN, J., dissenting.

APPEAL by defendant from *Whedbee, J.,* at September Term, 1914, of WAKE.

*Douglass & Douglass, R. N. Simms, and W. B. Snow for plaintiff. Murray Allen for defendant.*

CLARK, C. J. This is an action for personal injuries suffered by the plaintiff, while an engineer in defendant's employment, by the explosion of a water-glass on the defendant's locomotive, impairing the sight of

the plaintiff's right eye. The case was first here 157 N. C., 146, when a new trial was awarded. It was here again 162 N. C., 424, and upon writ of error it was then heard in the United States Supreme Court, 233 U. S., 492, and the writ being sustained, the case was remanded to the lower court, where, as we think, upon a review of the record, it has been tried strictly in conformity with that opinion of the United States Supreme Court.

The argument of the defendant seeks to put the plaintiff in this predicament: that if the likelihood of injury from an explosion of the glass was not apparent, then the defendant was not guilty of negligence; but, on the other hand, if such defect was apparent, then the plaintiff assumed the risk and is equally barred from recovering damages.

But that was not the ruling of the United States Supreme Court, as we understand it. That Court held: "When the employee knows of a defect in the appliances used by him, and appreciates the resulting danger, and continues in the employment without objection or without obtaining from the employer an assurance of reparation, he assumes the risk, even though it may arise from the employer's breach of duty. But where there is promise of reparation by the employer, the continuing on duty by the employee does not amount to assumption of risk, unless the danger be so imminent that no ordinarily prudent man would rely on such promise."

The plaintiff testified that he notified the proper official that the guard-glass was gone, and asked for one, and the reply was that the road did not have any in stock, but had them in Portsmouth, and the company would send there and get one, and said that the plaintiff would "have to run the engine like she was."

There was evidence from which the jury could find that while the absence of the guard-glass was a defect causing danger to the plaintiff, and which amounted to negligence on the part of the defendant, yet it was not such an imminent danger as would justify excusing the defendant, if the plaintiff remained on service after reporting the defect and receiving assurance that it would be repaired. The court properly told the jury that "Risks not naturally incident to the occupation may arise out of the failure of the employer, the defendant in this case, to exercise due care with respect to providing a safe place of work and suitable and safe appliances for the work. These latter risks the employee is not treated as assuming until he becomes aware of the defect or disrepair or of the risk arising from it, unless the defect and risk alike are so obvious that an ordinarily prudent person under the circumstances would have observed and appreciated them."

The court further charged: "When an employee does know of the defect and appreciates the risk that is attributable to it, then if he con-

tinues in the employment without objection, or without obtaining from his employer or representative the assurance that the defect will be remedied, the employee assumes the risk, even though it arises out of the master's breach of duty. If, however, there be a promise of reparation, even during such time as may be reasonably required for its performance or until the particular time specified in such performance, the employee relying upon the promise does not assume the risk unless at least the danger be so imminent that no ordinarily prudent man would rely upon such promise."

The defendant excepted to the above instructions, but we think it is strictly in accordance with the decision of the United States Supreme Court in this case, and that upon the evidence the jury were authorized to find, as they did in response to the second issue, that the plaintiff did not assume the risk of injury.

There are numerous other exceptions, but this case has been so fully considered in every aspect of the law and the facts have been so fully set forth on the two former appeals in this Court, and also upon consideration of the writ of error in the United States Supreme Court, that it would be work of supererogation to go over the same ground a fourth time.

The very careful and learned judge who tried this case below seems to have fully comprehended and to have closely and carefully followed the decision of the United States Supreme Court upon the points on which that Court gave a new trial, and we find no error in his rulings.

The only other exception that we need refer to is the refusal by the court below of the motion for a new trial for newly discovered evidence. Such refusal was discretionary with the court, and is not reviewable here. It is true, the judge stated that the newly discovered evidence, if true, was merely cumulative. But that does not justify us in reversing his judgment denying the motion for a new trial.

The defendant's cause has been very fully and ably presented, but we find nothing that would justify us in setting aside the verdict and judgment. The court and jury had the benefit of all the light that could be shed upon this controversy, from every angle, by this Court and the United States Supreme Court, and seem to have faithfully followed the views of the Court of highest resort where it differed from the views of this Court, and in other respects to have followed the well settled decisions of this tribunal.

No error.

BROWN, J., dissenting: I am unable to agree with the conclusion reached by the Court in this case. The decision of the United States Supreme Court leaves it open to us to say whether the plaintiff, as a

matter of law, assumed the risk of injury from the defective water-glass. That question was not passed upon, and if it had been, upon the facts as then presented that would not prevent a consideration of the question upon this appeal, when the facts showing assumption of risk are much stronger.

The United States Supreme Court reversed our judgment and remanded the cause for further proceedings not inconsistent with their opinion.

*Mr. Justice Pitney* states the law of this case as follows: "When the employee does know of the defect, and appreciates the risk that is attributable to it, then if he continues in the employment without objection, or without obtaining from the employer or his representative an assurance that the defect will be remedied, the employee assumes the risk, even though it arise out of the master's breach of duty. If, however, there be a promise of reparation, then during such time as may be reasonably required for its performance, or until the particular time specified for its performance, the employee, relying upon the promise, does not assume the risk unless at least the danger be so imminent that no ordinarily prudent man under the circumstances would rely upon such promise." *Seaboard Air Line Railway v. Horton,* 233 U. S., 492.

Applying this rule to the undisputed evidence, I am of opinion that the plaintiff assumed the risk of injury and is not entitled to recover.

Plaintiff was operating an engine equipped with a Buckner water-glass, which is so constructed that a thick guard-glass is placed over the front of the water-glass to protect the engineer from injury in the event the inner glass should explode. The engine was also equipped with another method of determining the amount of water in the boiler, that is, by means of gauge cocks placed on the head of the boiler. Plaintiff made the first trip from Raleigh to Aberdeen on 27 July, returning in the evening of 28 July, and he was returning from the third trip to Aberdeen when he sustained the injury to his eye by the explosion of the water-glass, on 4 August. It required two days to make the round trip.

On the morning plaintiff was called to take this engine for the first trip to Aberdeen, he noticed before leaving Raleigh that there was no shield or guard on the water-glass. Without making complaint of the condition of the glass, plaintiff made the trip to Aberdeen and return. Upon his arrival in Raleigh at the end of his round trip, he made a written report of the condition of his engine upon forms provided for that purpose, and in accordance with the defendant's requirements he placed the report on file in the roundhouse or put it in a box there for that purpose. This, according to the plaintiff's evidence, was the way provided by the company for procuring repairs. Plaintiff, and a num-

ber of defendant's witnesses, said that these work reports were required to be in writing, that they were filed and distributed among the workmen for the purpose of making the required repairs. It appears in evidence that plaintiff made a written report on this engine at the return of each round trip, and noted every defect in his engine except the absence of the guard-glass.

On 4 August, while engaged in shifting cars at Apex, N. C., the water-glass exploded and injured his eye. Immediately after the explosion plaintiff cut off the gauge-glass at top and bottom, and the engine was operated to Raleigh with the gauge cocks as the means of determining the amount of water in the boiler.

The guard-glass referred to as part of the Buckner equipment is a thick piece of glass, 1 or 2 inches wide and 8 or 9 inches long, with a thickness of about one-half of an inch. Plaintiff testified that the piece of glass in front of the tube is to prevent the flying glass from hitting the engineer in case the inner tube should burst; that the insertion of this glass will prevent flying glass from striking the engineer or other persons in the cab if the tube explodes. In answer to questions on cross-examination, plaintiff testified: "Yes, it is dangerous to run it (the engine) without a guard-glass. You see, the tube might explode. The guard-glass is put there to prevent the explosion of the inner tube injuring the engineer. The purpose of the guard-glass is to make it safe for the engineer to operate his engine with the Buckner water gauge." Plaintiff further testified that at the time of the accident the steam pressure in the unprotected glass tube in the Buckner gauge was 200 pounds, and that it was liable to explode at any time. He said: "I knew that with that guard-glass out that the tube was liable to explode with the 200 pounds pressure on it. I knew that it was liable to explode, but I could not tell when." At the time of his injury plaintiff was sitting on the left-hand side of the cab, facing the glass, which was within a few feet of his face. He said: "I was going to cross over on the fireman's side to see the conductor, whether he was ready to couple up, and that put me directly facing the glass, with my eye directly opposite that slit," and while in this position the explosion occurred. Plaintiff gave an estimate of the dimensions of the inner tube, as follows: "12 or 14 inches long and about three-eighths of an inch thick, and one-half inch in diameter."

Plaintiff described the method of gauging the water in the boiler by the three gauge cocks, and said that Benton, his fireman, brought the engine in from Apex to Raleigh, using the gauge cocks to tell how much water he had in the boiler. This was immediately after the accident. He said that he did not cut out the water gauge and use the gauge cocks on any of the three trips he made with this engine; that he did not

attempt to run the engine without the water-gauge glass. On a former occasion a water-glass exploded and injured plaintiff's eye, while he was employed on one of defendant's engines.

Ernest Horton, plaintiff's witness, testified: "The water-glass and gauge cocks are right upon the head of the boiler, right at hand, and he has to use them in running his engine—not constantly, though. They are there all the time for his use. By turning those three gauge cocks you can gauge somewhere near about the water in the boiler, but you cannot tell the perfect level. The guard-glass on the Buckner water gauge is to prevent the glass from spattering in your face when the inner tube bursts that comes out with the water and steam. This glass is put in there to prevent the glass from sputtering out in case that glass bursts."

Dave Campbell, an engineer of ten years experience, testified that an engineer can operate an engine in safety by the use of the gauge cocks; that if his water-glass guard is missing, it would be his duty to cut out the glass and use the gauge cocks.· He said: "It is very dangerous to use the Buckner water gauge without the guard-glass, because it has a tendency to throw the glass in a certain direction if it explodes. That glass tube on the Buckner water gauge is liable to explode. I have shut off the water gauge and run on the gauge cocks many a time." Lewis Archer testified for the defendant that he has been in the railroad business since 1882; that he is familiar with the construction and operation of the Buckner water-glass. "It is a safe water-glass with the guard-glass in place. With the guard-glass out of place, it is one of the most dangerous things you could have on an engine, on account of that slot; when the glass breaks, it throws the glass out of that one place. You can operate an engine without a water gauge with safety, by using the gauge cocks. I consider that the safest plan of operation."

In my opinion, the only conclusion to be drawn from this evidence is that no man of ordinary prudence would have continued to work in the face of so great and so imminent a danger. The defendant moved for judgment of nonsuit at the conclusion of the evidence and requested the court to instruct the jury that if they believed the evidence they would answer the issue of assumption of risk "Yes." This has the effect of a request to withdraw the case from the jury.

It is said to be well settled by the Supreme Court of the United States that it is the duty of the trial court to withdraw a case from the jury where the evidence is undisputed or is so conclusive that the court, in the exercise of its discretion, must set aside a verdict returned in opposition to it. *Randall v. R. R.,* 109 U. S., 478; *R. R. v. Converse,* 139 U. S., 469. This rule has been applied by the Court in an action involving the

defense of assumption of risk, where it appeared from plaintiff's evidence that he assumed the risk.   *Butler v. Frazee,* 211 U. S., 459.

In the case of *District of Columbia v. McElligott,* 117 U. S., 622, the United States Supreme Court has applied the doctrine which, in my judgment, sustained the defendant's right to an instruction that plaintiff assumed the risk of injury.   In that case the plaintiff, who was in the employ of the District, was injured while at work on a bank of gravel. The evidence tended to show that he discovered that there was danger of the bank caving in, and went to the supervisor for more men to do the work, and for one man to watch the bank, and that he received the information that such assistance would be sent.   Before the assistance arrived the bank caved in, causing his injury.   The Court said: "Assuming that the District might be responsible under some circumstances for injuries resulting from the negligence of its supervisor, it certainly would not be liable if the danger which the plaintiff apprehended from the beginning was so manifest as to prevent a reasonably prudent man from risking it upon a promise or assurance by the proper authority that the cause from which the peril arose would be removed. . . . If he failed to exercise such care, if he exposed himself to dangers that were so threatening or obvious as likely to cause injury at any moment, he would, notwithstanding any promises or assurances of the District supervisor of the character alleged, be guilty of such contributory negligence as would defeat his claim for injuries so received."   *Roccia v. Coal Co.,* 121 Fed., 451; *Attleton v. Mfg. Co.,* 5 Ga. App., 779; *R. R. v. Watson,* 114 Ind. In *Alteriac v. Coal Co.,* 161 Ala., 435, it is held: "Where a miner of many years experience saw a pot- or bell-shaped rock in the roof of a mine, and knew that it was more or less disconnected and liable to fall without warning at any moment, and after telling his superior of it, and that he would not work without timbers, but who returned to the work under the pot- or bell-shaped rock on being told to do so, and on the promise that the timber would be sent at once, assumed the risk incident to his return and work thereunder."   In *Erdman v. Steel Co.,* 59 Wis., 6, the Wisconsin Supreme Court holds: "An experienced servant cannot recover if he continues, even for an hour or two, to encounter the obvious and immediate danger of using a cracked saw to cut steel plates." In the case of *McAndrews v. R. R.,* 39 Pac., 85, in which the plaintiff continued to use a defective hand-car which was likely to jump the track at any moment, the Supreme Court of Montana says: "If the machinery is not only defective, but so obviously dangerous that no ordinarily prudent man would assume the risk of using it, and the employee does use it, knowing its absolutely and obviously dangerous condition, and the dangers of using it, the master is not liable, notwithstanding the promise to remedy the defect."

These cases illustrate the rule that after promise to repair the workman assumes the risk if the danger is such that a prudent man would not continue to work in the face of it. That the danger in this case is of that character appears to me to require no argument.

I am of opinion, also, that defendant's request for instruction that plaintiff was guilty of contributory negligence should have been given. This is a question of law when the facts are undisputed. *Strickland v. R. R.,* 150 N. C., 4; *Aerkfetz v. Humphries,* 145 U. S., 418. Plaintiff used the defective water-glass when he had at hand a safe way to operate his engine, that is, with the gauge cocks. This was contributory negligence. *Covington v. Furniture Co.,* 138 N. C., 74; *Whitson v. Wrenn,* 134 N. C., 86.

There are other exceptions in the record which are discussed in defendant's brief, raising important questions, but which I will not discuss. What I have written presents my views upon the main questions.

WALKER, J., concurring: The facts as now presented are not materially different from those before us on the former appeal. There was then a motion to nonsuit, which was passed by the Supreme Court of the United States without comment. It was hardly necessary to order a new trial for error in the charge if, upon the whole case, the plaintiff was not entitled to recover by reason of the assumption of risk. It is, therefore, to be fairly if not necessarily inferred, from the refusal to nonsuit, that there was, at least, some phase of the evidence that carried the case to the jury. The motion to nonsuit was entitled to first consideration, as if decided favorably to the defendant (plaintiff in error) it fully and finally disposed of the case, and the other questions raised by the assignments of error would, therefore, have become immaterial. But if this were not so, the motion should not now be allowed. It is true that the water gauge was "liable to explode," but an explosion was not so imminent as to require that Horton should quit the service of defendant, when he had been promised that the glass gauge would be repaired. A prudent man would probably take such a risk, and it was for the jury to say whether he would. He did not continue his work for any unreasonable length of time, but only for a very short time, and the question of assumption of risk or contributory negligence was eminently a proper one for the jury. Nor can it be said that plaintiff's failure to use the three gauge cocks on the head of the boiler was negligence, as matter of law. He testified that they could be used and sometimes were used for the purpose of gauging the quantity of water in the boiler or to ascertain its level, but that they are not altogether reliable or accurate, for he said that they would gauge somewhere near the quantity of water, but will not give the perfect level. He stated that an engine can be run without a water-glass and with gauge cocks, if the latter will stay open, but that they are liable to be-

come clogged and are easily stopped up by mud or sediment from the water. To give his language: "Yes, you can operate an engine without a water gauge, and with the gauge, but not as well. You cannot keep these cocks open; they are liable to stop up. But a water-glass has got so much bigger opening here than the gauge cock. They are the safest thing at all, as they do not stop up like gauge cocks—like all of the gauge cocks I have seen." He further stated that the mud could not be blown out if the gauge cocks are packed with it. He said much more in regard to this feature of the case, but the above references to his testimony are sufficient to demonstrate that the case was one for the jury on the question of assumption of risk or contributory negligence.

A motion to nonsuit, or a request for a peremptory instruction to find for the defendant, requires that the evidence should receive the most favorable construction for the plaintiff, and, under our rule, the evidence only that sustains his cause of action should be considered, because the jury might adopt it and reject all the unfavorable testimony. "It is well settled that, on a motion to nonsuit or to dismiss under the statute, which is like a demurrer to evidence, the court is not permitted to pass upon the weight of the evidence, but the evidence must be accepted as true and construed in the light most favorable to the plaintiff, and every fact which it tends to prove must be taken as established, as the jury, if the case had been submitted to them, might have found those facts upon the testimony." *Brittain v. Westall,* 135 N. C., 492, citing *Purnell v. R. R.,* 122 N. C., 832; *Hopkins v. R. R.,* 131 N. C., 163. More recent cases, affirming the principle, are *Freeman v. Brown,* 151 N. C., 111; *Morton v. Lumber Co.,* 152 N. C., 54; *Johnston v. R. R.,* 163 N. C., 431; *Lloyd v. R. R.,* 166 N. C., 24; *Trust Co. v. Bank, ibid.,* 112. The rule of the Federal courts as to the right of the judge to suggest what the verdict should be does not apply to a case tried in the State court, even where the cause of action is given by a Federal statute like the Employers' Liability Act. The power to advise the jury as to their verdict is not equivalent to the right to direct a verdict or to nonsuit, or to dismiss the action. Congress, having conferred concurrent jurisdiction on the State courts in such cases, did not undertake, if it had the power to do so, to regulate the procedure and practice in those courts. The plaintiff might elect to sue in the State court, and if he did so elect, it was, of course, intended that the suit should be tried according to the local practice and procedure. *Fleming v. R. R.,* 160 N. C., 196. It would be anomalous to try a case in the State court according to a procedure foreign to its jurisdiction. We take it, therefore, that on motion to nonsuit, the evidence, with reference to its probative force and its construction, must be considered with due regard to our practice, as it relates to the remedy. *Florida v. Anderson,* 91 U. S., 667. And this is clearly so where there is no rule on the same subject prescribed by act of Congress creating the

right, or where the State rule does not conflict with any such law. *Re Fisk,* 113 U. S., 713. ` The same is the rule as to evidence, *Ryan v. Windley,* 1 Wall. (U. S.), 66; as to a discontinuance, *Coffee v. Planters Bank,* 13 How. (U. S.), 183; as to what is a material variance, *L. and L. and G. Ins. Co. v. Gunther,* 116 U. S., 113, and, of course, as to the construction of pleadings upon the question of their sufficiency, *Chouteau v. Gibson,* 111 U. S., 200. Many other examples might be stated which would illustrate to what a great extent the highest Federal court has gone in conforming the practice, pleadings, forms and modes of proceedings, as near as may be, to those of the State courts, both under the Federal statutes and under the general rule applicable to such questions. If, therefore, we follow this rule of procedure, the court cannot, under our decisions, consider the testimony of David Campbell, the defendant's witness, or any other part of the testimony offered in its behalf, when passing upon the motion for a nonsuit, except in so far as such testimony favors, or tends to establish, the plaintiff's right to recover; and this rule applies also to defendant's request for a special instruction to the effect that, if the jury believed the evidence, they should answer the issue as to assumption of risk in the affirmative.

But even if the practice and procedure of the Federal courts are applicable, there is ample evidence, as the record shows, to require the submission of the case to the jury, as it will appear by reading the testimony that the choice between a safe method of running his engine and a dangerous one was not left to the plaintiff. Both methods were dangerous. The glass water gauge was safer, in one respect, than the gauge cocks, because it recorded the height of the water in the boiler more accurately and was more likely to prevent an explosion of the boiler, while it presented an element of danger itself because of the absence of the guard-glass, and the gauge cocks were dangerous because they did not gauge the quantity of water in the boiler with accuracy, and, having a small tube and being of a different construction, they were liable to be stopped up by mud and sediment in the water. The jury only could decide what a man of ordinary prudence would have done in the circumstances. Whether plaintiff reported the defect in the water gauge and was told that it would be repaired was certainly a question for the jury to decide, in the conflict of testimony. Some extracts from the testimony will, I think, fully sustain these views:

The plaintiff, James T. Horton, testified: "I told Powie Matthews that the guard glass was gone, and asked him if he had any of them. He was the day roundhouse foreman, and he said no, they did not have any here. I told him the guard glass to the water-glass was gone, and he said they did not have any and did not keep them in stock, and they were in Portsmouth, but he would send to Portsmouth and get one. He said, 'You will have to run her like she is.'"

Powhatan Matthews testified: "I was asked the question as to whether Mr. Horton reported the absence of that glass, and said, 'I do not remember,' and I do not. That is as far as I go and is as far as I know. *I do not remember. I do not deny it."*

Edgar W. Barbee testified: "As to the duty of an engineer in respect to obtaining a guard glass or flag or torpedoes, fuses, or anything of that nature, or oil cans, from the storeroom, I would tell the foreman I did not have it. It was customary to send the fireman for it. The requisition would come from the foreman. The foreman would send the article to me. I would put it in myself. You would drop it in just like you put a quarter in a slot machine. . . . Yes, they do pay attention to verbal requests. Yes, you can, that·way, send your fireman and get a guard glass, if they have them in stock."

· J. A. Massey testified: "I had charge of the storeroom. . . . I know who applied for them (guard glasses); the engineers did. They would apply to the master mechanic, general foreman, or the foreman. The glass in the Buckner glass was a *supply*. I did not have any Buckner water guard glasses in stock down there on 4 August, 1910. I did not have any between 27 July and 4 August. . . . If the engineer wanted a lamp, or flag, or a torch, or torpedoes, or a piece of glass to drop into one of these guards, he would report it to the master mechanic, or the general foreman, or the foreman, and ask him for a requisition for whatever article he wanted, and bring that requisition to the storeroom, and he would get that directly and not through the written report of the engineer for repairs."

This evidence shows that defendant had notice that the guard glass was missing; that plaintiff had exercised care and diligence in restoring it, and that he had complied with the rules of the company. The plaintiff testified: "I did not say with pressure on that tube in the glass case that the water-glass is liable to explode at any time. ·No, that is not so. I have run those a year without their exploding. . . . No, I did not know if it did explode without the guard glass that it would be liable to hurt the engineer, as I have seen lots of them explode without hurting the engineer. . . . Yes, you can operate an engine without a water gauge, with water cocks, but not as well, as you cannot keep these cocks open; they are liable to stop up. But a water-glass has not so much bigger opening here than the gauge cock. They are the safest things at all, as they do not stop up like the gauge cocks—like all of the gauge cocks I have seen. . . . I did not attempt to cut it off. I needed it. I did not attempt to run my engine without it."

Ernest Horton, on this point, testified: "It may last a day, a week, a month, or a year, and it may last an hour or shorter. . . . Would it be the proper thing, in the event there was no guard glass on the water gauge, to shut off the water-glass and run the engine with a gauge cock?

Answer: The proper way, in my opinion, would be to run with the water-glass turned on. . . . What is the proper and safe thing to do? Answer: The proper way, in my opinion, would be to run with the water-glass turned on. . . . I have not had one (gauge glass) to explode with me in the last year, to my knowledge. . . . In case it does not leak, I do not shut it off."

Edgar W. Barbee, witness for defendant, testified: "Yes, it is true that engineers on the Seaboard run their engines out with the water-glass, without cutting it off, with the guard glass missing, prior to the time Mr. Horton was injured."

From this and much testimony of the same character, it is apparent that not only one, but many trips might be safely made with a water gauge unprotected by a guard glass or shield. A pregnant circumstance, which was in evidence and for the jury's consideration, was the fact that the fireman, W. S. Benton, a witness introduced by the defendant, testified that he knew that the guard glass was broken; that in fact he was the man who broke it, as he started out on the first trip with the plaintiff, and that he did not call it to his attention, and that he sat directly in front of the water gauge during the entire trip to Aberdeen and the return trip from Aberdeen to Raleigh. That he made the second trip, also, and likewise faced the same unprotected water gauge, and did it again upon the return trip, and that he made the third trip from Raleigh to Aberdeen and again faced the unprotected water-glass, and that this explosion and injury to the plaintiff occurred on the return from the third trip to Aberdeen, and that he did all of this without thinking of being hurt.

These quotations from the testimony are made at random. A careful examination of it will disclose that there was a conflict of testimony upon the material issues, which, of course, takes the case to the jury.